1                IN  THE  UNITED  STATES  DISTRICT  COURT

2            FOR  THE  NORTHERN  DISTRICT  OF  WEST  VIRGINIA

3

4    United States of America,

5                          Plaintiff,

6    vs.                          Criminal Action No. 3:17-cr-70

7    Reba Marcelle Myers,

8    Lisa Renee Lindquist,

9                          Defendants.

10

11            Excerpt  of  proceedings  had  in  the  Jury  Trial  in  the

12    above-styled action on November 8, 2018, and November 9, 2018,

13    before the Honorable Gina M. Groh, Chief Judge, at Martinsburg,

14    West Virginia.

15

16    APPEARANCES:

17    On behalf of the United States of America:

18            Michael D. Stein
              Assistant United States Attorney
19            United States Attorney's Office
              P.O. Box 591
20            Wheeling, WV   26003

21            Christopher D. Jackson, Esq.
              United States Department of Justice
22            1400 New York Avenue, NW
              Washington, DC  20005

23

24    The Defendants were present in person.

25    Proceedings reported by means of stenotype; transcript produced
      by official court reporter.

```
1   APPEARANCES (Continued)

2

3   On behalf of the Defendant, Reba Marcelle Myers:

4
            Robert C. Stone, Jr., Esq.
5           Robert C. Stone Jr., PLLC
            529 West King Street
6           Martinsburg, WV  25401

7

8   On behalf of the Defendant, Lisa Renee Lindquist:

9           Barry P. Beck, Esq.
            Nicholas J. Matzureff, Esq.
10          Power, Beck & Matzureff Law Offices
            308 W. Burke Street
11          Martinsburg, WV  25401

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          INDEX TO WITNESSES

2

3                                                    Page

4    TESTIMONY OF JOHN FAIRCHILD

5       Direct Examination by Mr. Stein            4

6       Cross Examination by Mr. Stone             21

7       Cross Examination by Mr. Beck              60

8       Redirect Examination by Mr. Stein          77

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1    (The following are excerpts from the trial proceedings held

2    11/8/2018 and 11/9/2018.)

3                               - - -

4    (11/8/2018, 11:56 A.M.  Defendants and their counsel are

5    present, Government's counsel are present; and the jury is

6    present.)

7                               - - -

8         THE COURT:  Next witness.

9         MR. STEIN:  The United States calls John Fairchild.

10        THE COURT:  We're going to go until about 12:30 with

11   his testimony, and then we're going to break for lunch.

12   (The witness was sworn in.)

13        THE CLERK:  You may have a seat in the witness chair

14   and please watch your step.

15        THE COURT:  You may proceed, Mr. Stein.

16                    DIRECT EXAMINATION

17   BY MR. STEIN:

18   Q.  Please introduce yourself to the jury.

19   A.  My name is John Fairchild.

20   Q.  And where do you live, Mr. Fairchild?

21   A.  248 Bay Avenue, Patchogue, New York 11772.

22   Q.  And have -- how long have you lived in the New York

23   area?

24   A.  My whole life.

25   Q.  Have you been convicted of trafficking in Virginia-only

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1  taxed cigarettes?

2  A.  Yes.

3  Q.  And were you purchasing those cigarettes in the Winchester,

4  Frederick County area?

5  A.  Yes, I was.

6  Q.  What was your favorite distributor of contraband-quantity

7  cigarettes?

8  A.  Dollar Stretcher.

9  Q.  And did you -- who -- did you -- who did you regularly deal

10  with?

11  A.  Reba and Lisa.

12  Q.  Was that in person or otherwise?

13  A.  Sometimes in person and sometimes otherwise.

14  Q.  And how would the otherwise dealings be?

15  A.  Some people that would go down there and get them for me

16  would deal with them.

17  Q.  Would you also deal sometimes by -- with the store either

18  by telephone or text messaging?

19  A.  There was some text correspondence.

20  Q.  How often when you were doing it did you travel to

21  Winchester, Virginia and the Dollar Stretcher store?

22  A.  Weekly.

23  Q.  And you said that you dealt with the owner, Reba; is that

24  right?

25  A.  Yes.

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1   Q.   And would you -- is she in the courtroom?

2   A.   Yes, she is.

3   Q.   Would you point her out and describe an article of

4   clothing.

5   A.   She's sitting next to the gentleman with the purple tie and

6   some glasses on her head.

7            MR. STEIN:   May the record reflect that the witness

8   has identified Defendant Myers?

9            THE COURT:   The record will so reflect.

10  BY MR. STEIN:

11  Q.   And the person that you referred to as Lisa, is she in the

12  courtroom?

13  A.   Yes, she is.

14  Q.   Would you point her out and describe an article of

15  clothing.

16  A.   She's sitting on the left over here in the middle of these

17  two gentlemen with the glasses on.

18           MR. STEIN:   May the record reflect that the witness

19  has identified Defendant Lindquist?

20           THE COURT:   The record will so reflect.

21  BY MR. STEIN:

22  Q.   How -- you said you regularly dealt with them.  What does

23  regularly mean to you?

24  A.   Once or twice a week.

25  Q.   And on those once or twice a week, about what percentage of

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1  the time would one or the other have taken care of you?

2  A.  Ninety percent of the time.

3  Q.  And out of that 90 percent of the time, on the overlap

4  about what percent would they both be there?

5  A.  Like 75 percent.

6  Q.  And on other occasions, do you remember who you would deal

7  with at the Dollar Stretcher?

8  A.  Once in a while somebody else that was working that day or

9  night.

10  Q.  Do you remember any names?

11  A.  Joy and that's about it.

12  Q.  How did you usually pay?

13  A.  Cash most of the time.

14  Q.  And I take it that some of the time a different way?

15  A.  Sometimes I would use a credit card or a debit card.

16  Q.  Let me show you what has been marked as Exhibit 44.  And

17  what is Exhibit 44?

18  A.  It's a statement of my credit card.

19  Q.  And when was the bill of that credit card due?

20  A.  January 1, 2013.

21          MR. STEIN:  I would offer Exhibit 44.

22          MR. STONE:  No objection.

23          MR. BECK:  No objection, Your Honor.

24          THE COURT:  Admitted.

25          (Government's Exhibit No. 44 was admitted.)

8

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   BY MR. STEIN:

2   Q.   Would you look at page 2.  And do you see two purchases on

3   November 11th, one below the other?

4   A.   Yes, I do.

5   Q.   And where were those purchases?

6   A.   Dollar Stretcher.

7   Q.   And the first purchase, the top one of those two, how much

8   is that for?

9   A.   $243.86.

10  Q.   And what did you purchase for that amount of money?

11  A.   Five cartons of cigarettes.

12  Q.   And the purchase immediately below that, how much is that

13  for?

14  A.   1,299.38.

15  Q.   And how many cartons is that approximately?

16  A.   Twenty-five.

17  Q.   And so the total price was 25.  Is that consistent with 30

18  cartons?

19  A.   Yes.  Well, it's also consistent with the way they would

20  sell them.

21  Q.   Well, I think we've gone through that so we'll just move

22  on.

23      Did Ms. Myers and Ms. Lindquist know that you were from New

24  York?

25  A.   Yes.

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1   Q.   And how do you know they knew that?

2   A.   When I talk, they notice my accent.

3   Q.   Anything else?

4   A.   Yeah.  We -- you know, have a safe trip back home.

5   Q.   Did --

6           MR. STEIN:  Would you put Exhibit 78-E on the screen,

7   please.

8   BY MR. STEIN:

9   Q.   And do you recognize that text message?

10  A.   Yes, I do.

11  Q.   And why don't you read it.

12  A.   "Hi, Joy.  It's John.  Please let Reba know this is her

13  winning New York Powerball ticket."

14  Q.   And what is that all about?

15  A.   She'd given me money to buy a Powerball ticket in New York.

16  Q.   When -- on all those trips to Dollar Stretcher, did you

17  think -- did you see other traffickers also at that store

18  buying contraband quantities of cigarettes?

19  A.   Yes, I saw some other people.

20  Q.   Did you recognize them as people that you had seen there

21  and at other places purchasing contraband quantities of

22  cigarettes?

23  A.   Yeah.  I would recognize them in the car.

24  Q.   And would there be anything distinctive about the car?

25  A.   Out-of-state plates.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   Q.  And where did you sell the Virginia-only tax cigarettes

2   that you purchased at the Dollar Stretcher?

3   A.  I sold them on my coffee trucks in New York.

4          MR. STEIN:  May I approach?

5          THE COURT:  Yes, sir.

6   BY MR. STEIN:

7   Q.  Let me show you Exhibit 39.  And let me retrieve that and

8   let me -- this has been admitted.

9      Without going into detail, what is Exhibit 39?

10  A.  It's me giving cigarettes to a coffee truck that I do

11  business with.

12  Q.  Okay.

13         MR. STEIN:  I would offer Exhibit 39.

14         MR. STONE:  No objection.

15         MR. BECK:  No objection, Your Honor.

16         THE COURT:  Admitted.

17         (Government's Exhibit No. 39 was admitted.)

18  BY MR. STEIN:

19  Q.  And where are you in that photograph?

20  A.  I'm at the trunk of that vehicle with a bag of cigarettes.

21  Q.  And what is behind you?

22  A.  A coffee truck.

23  Q.  And is this where the distribution is taking place?

24  A.  Yes.

25  Q.  When you traveled back from Winchester to New York with the

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1  contraband cigarettes, what route did you take at least for the

2  first maybe hundred miles?

3  A.  I would travel north on 81 to 78 East.

4  Q.  So north -- would you travel through West Virginia that

5  way?

6  A.  West Virginia would be the first state I went through.

7  Q.  About how long did it take you to make that drive?

8  A.  It was about six hours to get home.

9  Q.  And how many hours did it take to get there?

10  A.  About five hours.

11  Q.  And why the difference?

12  A.  Traffic on the way back and getting over the bridges.

13  Q.  So before you made that five-hour drive, would you just

14  make that drive and hope they would have cigarettes or what

15  would you do?

16  A.  No.  It was understood that I was coming to pick up

17  cigarettes.

18  Q.  Would -- and was your practice -- how -- what was your

19  practice to let them know what you were doing?

20  A.  We had a standard order.  I would text it sometimes.

21  Q.  And who would the orders be texted to?

22  A.  Reba.

23  Q.  And let me show you exhibit --

24       MR. STEIN:  Would you put Exhibit 4-B on the screen,

25  please.

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1   BY MR. STEIN:

2   Q.  Does that -- these are text messages that were downloaded

3   from Defendant Myers' phone.  Do you see your phone number as

4   being the sender of a substantial number of these texts?

5   A.  Yes, I do.

6   Q.  And what is that phone number?

7   A.  631-855-5526.

8   Q.  And why don't you look at the top order on the screen.  And

9   what is that?

10  A.  It's a text order for cigarettes.  15 Marlboro Lights, 15

11  Marlboro, 15 Newports, and 5 Parliament.

12  Q.  And was that at that time your standard order?

13  A.  Yes.

14  Q.  And what was your actual practice in terms of -- you said

15  you went two times a week.  What were the days that you would

16  travel?

17  A.  Most of the time on Sunday and Wednesday.

18  Q.  What would you purchase on Wednesdays?

19  A.  I would get 50 of them.

20  Q.  And why -- and what would you -- what would you buy on

21  Sundays?

22  A.  Usually a hundred.

23  Q.  And when you would buy the cigarettes from Dollar Stretcher

24  and sell them in New York, would you use the money or a portion

25  of the money from the sale to buy the next round of cigarettes

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1    from Dollar Stretcher?

2    A.  Yes, I would.

3    Q.  And look at the first order on 10/20.  And what did you

4    order there?

5    A.  Fifteen Marlboros, fifteen Marlboro Lights, fifteen

6    Newports, and five Parliaments.

7    Q.  And about five seconds later, you corrected that order?

8    A.  I asked to double that order.

9    Q.  And why was that?

10   A.  It was a Sunday.

11   Q.  When you look at exhibit -- oh.  And look on -- at the

12   orders on July 25th.

13   A.  Uh-huh.

14   Q.  And is that your standard 50-carton order for then?

15   A.  Yes, it is.

16   Q.  And, specifically, who did you send that text message to to

17   make that order?

18   A.  Reba.

19   Q.  And again on the 7/28/2013 50-carton order, who did you

20   text message that order to?

21   A.  Reba.

22   Q.  And were those orders filled?

23   A.  Yes, they were.

24   Q.  And the 7/31 50-carton order, who was that texted to?

25   A.  Reba.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1  Q.  The 8/14/2013 50-carton order, who was that text message

2  to?

3  A.  Reba.

4  Q.  The September 11, 2013, 50-carton order, who was that text

5  message to?

6  A.  Reba.

7  Q.  The 10/16 50-carton order, who was that texted to?

8  A.  Reba.

9  Q.  And were all of these orders delivered to you when you

10  drove to Virginia?

11  A.  Yes.

12  Q.  And did you drive them all back through West Virginia to

13  New York?

14  A.  I can't remember.

15  Q.  Well, what was your route from --

16  A.  They were definitely driven back to New York.

17  Q.  And what was --

18  A.  I believe Dennis was picking them up though.

19  Q.  Oh.  Do you know what Dennis' route was?

20  A.  Yeah.

21  Q.  And what was Dennis' route?

22  A.  Dennis' route was to drive up 81 North, and he would call

23  me when he got to Pennsylvania.

24  Q.  Well, as you brought up Dennis, my question is did you have

25  runners working for you?

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   A.  I did.

2   Q.  Who was your first runner?

3   A.  Adam.

4   Q.  Look at --

5           MR. STEIN:  Put up 78-A on the screen, please.

6   BY MR. STEIN:

7   Q.  And how did you communicate with Adam?

8   A.  By text.

9   Q.  And on the -- is 78-A a text from you to Adam?

10  A.  Yes, it is.

11  Q.  And do you give him some instructions?

12  A.  Yes, I do.

13  Q.  And what did you tell him to do?

14  A.  Call Reba and order 125 Newport, 10 Newport 100s, 10

15  Newport Light, 40 Parliament, 5 Marlboro Menthol, 5 Kool box, 5

16  Newport Light 100.  Need to pick up tomorrow.

17  Q.  And how many cartons of cigarettes were you telling Adam to

18  order and having called Reba?

19  A.  There's 190 in that order.

20  Q.  Really?

21  A.  Wait a minute.  Sorry.  I misadded.  There's 200 in that

22  order.

23  Q.  Okay.  Would you look at Exhibit 78-B.

24          MR. STEIN:  Would you put that on the screen,

25  please.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   BY MR. STEIN:

2   Q.  And what is that?

3   A.  That's another text to Adam.

4   Q.  And do you give him any instructions on that?

5   A.  Yes.  Call Reba.  Order 135 Newports, 10 Newport 100s, 10

6   Newport Light, 10 Marlboro Menthol, 5 Kool box, 5 Newport Light

7   100, 10 Parliament 100, 5 Marlboro Medium, 5 Marlboro soft.

8   Need Wednesday.

9   Q.  And did he follow your instructions?

10  A.  Yes, he did.

11  Q.  Would you look at Exhibit 78-C.  And what instructions did

12  you direct your runner, Adam, to do this time?

13  A.  Text Reba, please, and order 98 Newport.

14  Q.  And how did he respond?

15  A.  That he set it up.  Ninety-eight green for Thursday.

16  Q.  What does green refer to?

17  A.  Green is Newports.

18  Q.  Now, let's switch over now from Adam and talk about

19  Dennis O'Connell who you have already said was one of your

20  runners.  How did his relationship with Defendant Myers

21  start?

22  A.  I brought him on a trip and introduced him.

23  Q.  Approximately when was that?

24  A.  Many years ago.  2011.  I don't know exactly.

25  Q.  All right.  Would about the winter of 2012 be a ballpark?

JOHN FAIRCHILD - DIRECT EXAMINATION BY MR. STEIN

1  A.  Yeah.  It's probably right.  If Adam was in 2011, then

2  Dennis was a little bit after him so that makes sense.

3  Q.  All right.  I would like you to look at Exhibit 15 which is

4  going to be on the screen.  And what is that?

5  A.  That's a rental receipt with my name on it.

6  Q.  And --

7  A.  My rental car.

8  Q.  And who do you make -- who is the rental from?

9  A.  Hertz.

10  Q.  Were you a regular customer?

11  A.  Yes, I was.

12  Q.  And what kind of business relationship did you have with

13  that Hertz rental facility?

14  A.  A very good one.

15  Q.  Did they -- what kind of prices did they give you?

16  A.  They gave me the lowest price they could give me, and they

17  always had a car there for me when I needed it.

18  Q.  And the car that was leased in this transaction, what kind

19  of car was it?

20  A.  A 2013 Mercedes.

21  Q.  And what was the purpose of the rental?

22  A.  For Dennis to drive up and get cigarettes.

23  Q.  Did you think it was a good idea at the time to have Dennis

24  drive to make a contraband cigarette run in a Mercedes?

25  A.  No, I did not.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   Q.  So what happened?

2   A.  It was the only vehicle they had.

3   Q.  And --

4   A.  I needed a vehicle.

5   Q.  Okay.  And what was the date of the rental?

6   A.  December 4, 2013.

7   Q.  And Dennis -- you delivered it to Dennis?

8   A.  Yes.

9   Q.  And sent him off to Virginia to buy cigarettes?

10  A.  Yes, I did.

11  Q.  Did he bring any back?

12  A.  Not that trip.

13  Q.  Why not?

14  A.  He got pulled over and the cigarettes were taken away.

15          MR. STEIN:  I have no further questions.

16          Mr. Fairchild, do you have any exhibits up there with

17  you?

18          THE WITNESS:  I do.  Thirty-nine.

19          MR. STEIN:  I will retrieve it.

20          THE COURT:  Mr. Stone, are you going to be a while

21  with this cross?

22          MR. STONE:  Probably, Your Honor.

23          THE COURT:  Okay.  Then this a good point to break,

24  ladies and gentlemen.  We'll take a lunch break.  It's 20 after

25  12:00.  Let's get back here about 1:50 ready to start.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1   Remember --

2           MR. STEIN:  I'm sorry.  Did you say 1:15?

3           THE COURT:  1:50.

4           MR. STEIN:  1:50.

5           THE COURT:  That will give us about an hour and 20

6   minutes or so to an hour and a half actually.  So, yeah.  So 20

7   after 12:00.  Yeah, 1:50 we'll get back on the record, ladies

8   and gentlemen.

9           Keep your minds free and open of the ultimate

10  outcome.  Don't discuss the case among yourselves.

11     (The jury was excused from the courtroom at 12:22 P.M.)

12          THE COURT:  Please be seated, everyone.

13          Mr. Fairchild, you're in the middle of your

14  testimony.  You need to be back here by 10 minutes to 2:00.

15  Remember since you're basically on the stand, even though you

16  step off for lunch, you can't discuss your case with anyone or

17  your testimony with anyone.  Okay?

18          THE WITNESS:  Okay.

19          THE COURT:  All right.  You're excused, sir.

20          THE WITNESS:  Thank you.

21          (Witness excused.)

22          THE COURT:  Anything, counsel, before we take our

23  break?

24          MR. STEIN:  No, Your Honor.

25          MR. STONE:  No, Your Honor.

JOHN FAIRCHILD – DIRECT EXAMINATION BY MR. STEIN

1              MR. BECK:  No, Your Honor.

2              THE COURT:  All right, folks.

3              (Recess 12:23 P.M. – 1:52 P.M.)

4              THE COURT:  Please be seated, everyone.  We're all

5    back in attendance except for Mr. Jackson.  Is he going to be

6    here momentarily?

7              MR. STEIN:  Yes, Your Honor.  There he is.

8              THE COURT:  All right.  Should we bring our jury

9    out?

10              MR. STEIN:  Yes, Your Honor.

11              MR. STONE:  Yes, Your Honor.

12              MR. BECK:  Yes, Your Honor.

13              THE COURT:  All right.  Okay.  We'll bring our jury

14   out.

15              Is Mr. Fairchild out in the wings somewhere?  Okay.

16   Come on up, Mr. Fairchild.  You can go ahead and get back up on

17   the stand while we're waiting.  All right.

18       (The jury returned to open court.)

19              THE COURT:  Please be seated, everyone.  Welcome

20   back, ladies and gentlemen.  Are we ready to proceed?  All

21   right.

22              Mr. Fairchild, remember you're still under oath.

23              THE WITNESS:  Yes.

24              THE COURT:  Mr. Stone.

25              MR. STONE:  Thank you, Your Honor.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1                        CROSS EXAMINATION

2     BY MR. STONE:

3     Q.  Good afternoon, Mr. Fairchild.  I'm Robert Stone.  I

4     represent Reba Myers.  You -- Mr. Stein asked you about your

5     cigarette business and how you got involved in it, and you

6     mentioned food trucks.  So what exactly was your food truck

7     operation?

8     A.  The food trucks on Long Island cater to different

9     businesses on Long Island.  So they bring them breakfast and

10    lunch and other items such as cigarettes, Red Bull, gum.  So

11    basically it's a deli on wheels.

12    Q.  And do you -- now, you indicated you supplied food trucks,

13    but did you actually own a few food trucks yourself?

14    A.  Yes, I did.  I have over the years.  Currently, I own two

15    of them right now.

16    Q.  All right.  So during the time period that you were

17    involved in the cigarette trafficking, how many trucks did you

18    have?

19    A.  At one point up to -- on my own never more than two and

20    then partnerships in a few of them.

21    Q.  All right.  And so your typical food truck, how -- I mean

22    how many cartons or packs of cigarettes would you outfit a food

23    truck with?

24    A.  It depends on the volume.  You know, they would just come

25    to me.  And if they needed five, they would buy five.  If they

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   needed ten, they would buy ten.

2   Q.  So --

3   A.  I mean on average -- on average, they bought maybe three or

4   four a week.

5   Q.  All right.  So each food truck operator?

6   A.  Yes.

7   Q.  And how many food truck operators do you think that you

8   supplied?

9   A.  I had about 40 of them.

10  Q.  All right.  And then -- you're not the only person buying

11  cigarettes down south or in Virginia and taking them back north

12  into New York or other states; right?

13  A.  No.

14  Q.  I mean are there -- do you have competitors --

15  A.  No.

16  Q.  -- in your business where you're at?

17  A.  No, I don't.

18  Q.  So you pretty much you ran the show in the area?

19  A.  Yeah.  My nickname is Johnny Cigs (spelled phonetically).

20  Q.  All right.  So it's not Johnny Smoke, it's Johnny Cigs?

21  A.  Johnny Cigs.

22  Q.  Okay.  So you had -- I mean did you have a specific

23  territory in Suffolk County or --

24  A.  It wasn't a territory.  I would just meet the trucks in the

25  morning and sell them cigarettes.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  Q.  All right.  Now, did you -- out on Long Island, you -- I

2  guess is one of the boroughs or two of the boroughs on Long

3  Island, and then you go out to -- what is it, Nassau County and

4  Suffolk County?

5  A.  Well, Long Island has two counties.  Suffolk County and

6  Nassau County.  The boroughs is the city and that's a

7  different -- different -- you know, there's five boroughs in

8  the city --

9  Q.  Okay.

10  A.  -- but I lived in Suffolk County, New York.

11  Q.  All right.  And is that the only county in which you

12  distributed your cigarettes?

13  A.  Yes, it was.

14  Q.  Now, what -- if you're supplying cigarettes to another

15  operator, what are you charging them for a case of cigarettes?

16  A.  Over the years, it had gone up.  On average, we'd

17  started -- I mean dependent on what I paid in Virginia, I would

18  wholesale it.  It was a wholesale business.

19  Q.  Uh-huh.

20  A.  So --

21  Q.  So what -- I mean if you're buying --

22  A.  My last carton I sold, I got $68 for it.

23  Q.  All right.  So --

24  A.  A carton of cigarettes.

25  Q.  And that would have been in what, November 2017?

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1   A.   Yes.

2   Q.   And so you're buying -- whatever you're buying them for in

3   Virginia --

4   A.   Yes.

5   Q.   I mean let's say you bought a carton for 50 bucks in

6   November 2017.

7   A.   It was probably a little higher than that.

8   Q.   So 60 bucks?

9   A.   In between 50 and 60.  Probably mid -- 55, 56.

10  Q.   So you're making -- when you sell the cigarettes by the

11  carton, you may make 10 or 12 bucks a carton?

12  A.   Yes.  On average.

13  Q.   All right.  And then that doesn't include whatever you had

14  to pay to get to Virginia and then get back to New York; right?

15  A.   No, it doesn't.

16  Q.   All right.  And with what you were doing -- I mean you had

17  a nickname.  Apparently, you're well known in your area.  Were

18  the local police, were they harassing you?  Were they coming by

19  trying to shut you down as far as you --

20  A.   No.

21  Q.   -- resupplying the trucks?

22  A.   No.

23  Q.   Now, your customers, the people who were buying off of your

24  truck, would they question the cigarettes that were being sold

25  and say, hey, you know, there's no New York tax stamps on

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1  these; I can't take these?

2  A.  They knew they were from Virginia.  They often said they

3  taste better.  They're fresher.

4  Q.  All right.  So nobody -- at least the people who are

5  working at the job sites and out in the public --

6  A.  They noticed too.  Everybody looks at the tax stamp.

7  Q.  But did they have any issue or problem about buying the

8  cigarettes?

9  A.  They would buy them.  They might make a snicker like you're

10  getting them very cheap.  Why are you selling them so high?

11  Q.  So what were you charging off the truck?

12  A.  The customers are buying.  They set their price.  What they

13  would charge.

14  Q.  What about your trucks?

15  A.  My trucks would get $10 a pack.

16  Q.  So you're -- each carton has got 20 packs; right?  No, ten

17  packs.

18  A.  Ten packs.

19  Q.  Ten packs in a carton.  Fifty-five bucks a carton for you.

20  So you go up the road, and you're selling your 10 packs of

21  cigarettes for $10 apiece.  So you're making $100.  Off of the

22  ones you sold, you're making $45?

23  A.  Yeah.  The three or four cartons on the one truck I would

24  make.

25  Q.  So for you it's better if your truck sells them as opposed

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  to selling them to someone else on their truck?

2  A.  Well, that would be the retail business.  And retail is

3  always better than wholesale.

4  Q.  All right.  Now, did any -- in the county or Suffolk

5  County, I mean I presume that they have some kind of county

6  officers that come and inspect the trucks or inspect businesses

7  just to make sure you're complying with all the local rules and

8  regulations.  Is that something that would happen?

9  A.  The Board of Health issues licenses once a year.

10  Q.  All right.  I mean are you subject to any kind of

11  inspections or anything?

12  A.  Yeah.  They check the oven temperature and the side

13  temperature to make sure that if we are selling any hot food or

14  cold food that it meets certain Board of Health regulations.

15  Q.  All right.  Did you ever have anybody from the Board of

16  Health or the county show up and say, you know, we've got a

17  problem with this truck; you got these cigarettes on it?

18  A.  No, they didn't.

19  Q.  So your business -- you mentioned that the last cartons of

20  cigarettes that you were selling would have been November of

21  2017; is that correct?

22  A.  Yes.

23  Q.  And do you agree that the Dollar Stretcher store closed

24  around the end of August, beginning of September 2015?

25  A.  Yes.  That sounds about accurate.

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1   Q.  All right.  And based upon your testimony, your business

2   continued until November 2017?

3   A.  That's correct.

4   Q.  All right.  So you would agree that the Dollar Stretcher

5   store was not indispensable to your business?

6   A.  No, it wasn't.  It made it harder to get them.

7   Q.  All right.  Now, in Winchester or Frederick County,

8   Virginia, you purchased cigarettes from numerous stores; is

9   that correct?

10  A.  Yes.  I purchased from several stores in that area.

11  Q.  All right.  Can you give us some examples of some other

12  retail stores from whom you would purchase cigarettes?

13  A.  The gas stations in the area.  You know, my main motivation

14  was price.

15  Q.  Okay.  So --

16  A.  And then, you know, quantity.  Some of them were very

17  strict on Newports whereas Dollar Stretcher would sell you

18  however many Newports you wanted.

19  Q.  All right.  So where Dollar Stretcher closed August,

20  September 2015, your operation continued until November 2017.

21  Where were you buying your cigarettes?

22  A.  I would get them from the Discount Outlet, Sheetz gas

23  station, the Exxon, the Dollar Saver.

24  Q.  So the Dollar Saver is a store separate from Dollar

25  Stretcher?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  A.  Yes, it is.

2  Q.  And -- but that's still in Frederick County, Virginia?

3  A.  Yes, it is.

4  Q.  And would you -- you went to Sheetz.  Did you go to the

5  same Sheetz?  Did you go to multiple Sheetz --

6  A.  You could --

7  Q.  -- stores?

8  A.  You could only buy five cartons at those establishments.

9  Q.  All right.  So now at Sheetz --

10  A.  There's a limit.

11  Q.  Now at Sheetz, you walk in, you buy five; right?

12  A.  Yes.

13  Q.  You walk out?

14  A.  Yes.

15  Q.  You walk right back in, you can buy five more?

16  A.  No, you cannot.

17  Q.  Really?

18  A.  Really.

19  Q.  So that's your sworn testimony?

20  A.  Yes.

21  Q.  And so you've never --

22  A.  You cannot.

23  Q.  You've never bought five cartons at Sheetz, walked out to

24  your vehicle, and walked right back in and buy five more?

25  A.  No.

29

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   Q.   Never?

2   A.   Because at Sheetz in 2017 you can't do that.

3   Q.   Well, I'm -- we're talking about the time period of the

4   indictment, 2015, 2014, 2013.

5   A.   No, you can't do that.  Exxon would only sell you 25.

6   Sheetz would only sell you five.  Dollar Saver would sell you

7   five Marlboros and five Newports, and then they would sell you

8   a different -- like maybe an American Spirit.  But they would

9   only sell five of Newports and five Marlboros.

10  Q.   All right.  Now, Mr. Fairchild, I mean I understand you got

11  a lot riding on this testimony today; right?

12  A.   What do you mean by that?

13  Q.   Well, you -- let's talk about this case.  You got indicted

14  October 3, 2017; is that correct?

15  A.   Yes.

16  Q.   And you knew beforehand that you were going to be indicted;

17  is that correct?

18  A.   Yes.  Homeland Security came to my house and told me of the

19  indictment.

20  Q.   All right.  And when you went to court to be arraigned on

21  your indictment, you were released on bail; correct?

22  A.   Yes.

23  Q.   And your pretrial release conditions that you signed

24  included provisions that you not violate the law; correct?

25  A.   Yes.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  Q.  And so contrary to the terms and conditions of your

2  pretrial release -- which you're still on; right?

3  A.  Yes, I am.

4  Q.  You actually continued to engage in cigarette trafficking,

5  and you continued to travel from New York to Virginia, and you

6  continued to buy large quantities of cigarettes at least once,

7  maybe twice a week; correct?

8  A.  No.  Actually --

9  Q.  Remember you're under oath.

10  A.  Yeah, I do remember I'm under oath; but I'm just thinking

11  about the times.  By that time -- no, I believe it was only in

12  October, and then it ended in November.  There was only three

13  times.

14  Q.  There was only three times?

15  A.  Yes.

16  Q.  Okay.  In actuality, on the day that you signed your plea

17  agreement, November 29, 2017, you'd actually been stopped by

18  law enforcement in West Virginia with a carload of cigarettes;

19  correct?

20  A.  That was the third time.

21  Q.  All right.  So you're on -- you've been indicted.  You're

22  on pretrial release.  You get stopped almost seven weeks after

23  you've been indicted, after you've been arraigned, and you're

24  still engaging in buying cigarettes and driving them north to

25  New York?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   A.   Yes.

2   Q.   And notwithstanding the fact that you were still engaging

3   in criminal conduct, blatantly violating the terms and

4   conditions of your bail.  You had a meeting the night you got

5   arrested at the state police barracks; correct?

6   A.   When they brought me in, I was arrested.  I guess that's a

7   meeting.

8   Q.   And you had a meeting with your lawyer, Mr. Stein, and

9   Deputy Ellinger; correct?

10  A.   They were there.

11  Q.   All right.  And you actually signed a plea agreement with

12  the Government; correct?

13  A.   Yes, I did.

14  Q.   And Mr. Stein and apparently probation -- I mean nobody

15  moved to revoke your pretrial release; right?

16  A.   No, they didn't.

17  Q.   So even though you were committing crimes, continuing --

18  continuing to traffic in cigarettes, you didn't get your bail

19  revoked?

20  A.   My entire life I have always been at a disadvantage, and

21  I've taken chances.  And this was another time that I took a

22  chance, and the cards fell where they did.  And I'm here today

23  to make amends for that and to move on with my life in a

24  different direction.

25  Q.   All right.  So before you got indicted, did you have any

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  idea that your cell phone calls were being wiretapped by the

2  authorities in Suffolk County?

3  A.  No.  I found out that -- November 29th I found that out.

4  Q.  All right.  So you had no idea that at the time, the

5  authorities of New York basically could listen to everything

6  going out and everything coming in?

7  A.  I had no idea about that.

8  Q.  And did you -- but you subsequently found out; right?

9  A.  I sure did.

10  Q.  All right.  And would you agree that when you found out

11  that Mr. O'Connell was going to come give a deposition that you

12  were extremely worried?

13  A.  That was before November 29th.

14  Q.  Well, I'm just asking you.  You were extremely worried that

15  he was going to --

16  A.  Well, I knew he was gonna, yeah.  I wasn't extremely

17  worried.  I just preferred he didn't.

18  Q.  All right.  I mean did you -- you engaged in these

19  conversations with people you knew saying that, you know,

20  O'Connell is a rat.  I can't believe he's going to talk about

21  me.  I mean that -- constantly; correct?

22  A.  I had mentioned to a couple of people because they knew him

23  personally so they used to buy cigarettes from him that he

24  would get from me.

25  Q.  You actually contacted his -- is it his nephew, John?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  A.  His nephew, John O'Connell, had actually begged me to give

2  his uncle a job --

3  Q.  Uh-huh.

4  A.  -- several years ago.  And that's how Dennis and I started

5  to work together.

6  Q.  All right.  You actually contacted his nephew, John, looks

7  like October 4, 2017.  Do you recall calling him and suggesting

8  that his uncle on the morning of the deposition act as if he

9  was having a medical problem and call for an ambulance so he

10 could avoid having to appear for the deposition?

11 A.  To his nephew?

12 Q.  Yeah.

13 A.  Yeah.  Him and I spoke.  I guess if that's --

14 Q.  I'm asking you.  I mean didn't you say that to him?  Didn't

15 you suggest you wanted some way --

16 A.  I had said to John -- I had said, you know, if you can't

17 make it to court, yeah.  I mean he's a very sick man.

18 Q.  Uh-huh.

19 A.  And with my limited legal expertise, in my mind, I thought

20 that would be sufficient for him to get out of giving the

21 testimony.

22 Q.  All right.  So you suggested that Mr. O'Connell's nephew

23 tell his uncle, "Act as if you're sick; call an ambulance; and

24 then that way, you won't have to appear for your deposition"?

25 A.  Considering that John, his nephew, was the individual that

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1    came to me many years ago and asked me if Dennis could work for

2    me.

3    Q.   Uh-huh.

4    A.   And at that time, he was too sick to run a food truck.   And

5    the only thing that I had going on was a trip to Virginia that

6    he could do.   So when --

7    Q.   So you felt like he owed it to you?

8    A.   No, I didn't feel like he owed it to me --

9            MR. STEIN:   Your Honor, I object to him interrupting

10   the witness's answer.

11           THE COURT:   Mr. Stone.

12           MR. STONE:   No problem, Your Honor.

13           THE COURT:   All right.

14           MR. STONE:   He can say whatever he wants.

15           THE COURT:   Sustained.

16   A.   John and I have been friends since elementary school.   John

17   and his family used to drive me to school when I didn't have a

18   mother or father to take me to school.   And so John and I go

19   way way back.   So when John had asked me to hire his uncle, I

20   hired him.   And so I called John as the same friend that would

21   drive me to school when I couldn't get to high school.   And I

22   was just -- like I said, my legal expertise, I was hoping there

23   was some way for me to get out of this.

24   Q.   So you actually were hoping there was some way that your

25   friend could intervene and try to obstruct the Government's

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   investigation?

2   A.  No.  I was just hoping that -- I -- that's not what I was

3   hoping.  I was hoping that the same friend that asked me for a

4   favor to hire his uncle, I was just talking to him.

5   Q.  All right.  With regard to your cigarette activities, you

6   were stopped in Pennsylvania July 10, 2016, by a state trooper;

7   is that correct?

8   A.  Yes, I was.

9   Q.  And the trooper -- he stopped you for speeding.  Ultimately

10  after some discussions, he searches your car; and you've got,

11  what, about 332 cartons of cigarettes in your trunk?

12  A.  There was actually, if I'm not mistaken, 334.  One was

13  missing --

14  Q.  Okay.

15  A.  -- and they charged me with 333.

16  Q.  All right.

17  A.  But one was missing.

18  Q.  All right.  Now, this is July 10, 2016, and we're talking

19  about approximately 11 months after -- 10 months after Dollar

20  Stretcher has closed.

21  A.  Okay.

22  Q.  I mean is that accurate?

23  A.  You have the dates there.  I would say it is.

24  Q.  All right.  And so you are still engaging in your

25  operations even though your primary source, the Dollar

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1  Stretcher, is closed?

2  A.  It was very difficult at that time.

3  Q.  It was very difficult at that time?

4  A.  Because after that -- after the Dollar Stretcher closed,

5  getting cigarettes in Winchester was never the same.

6  Q.  Oh, okay.  Well, do you have any idea why you told the

7  trooper that this was your approximately 50th run with

8  cigarettes this year?  You begin your runs early in the morning

9  from Long Island, New York.  You head to eight or nine selected

10  stores in the Winchester, Virginia area.  Fairchild then loads

11  up approximately $20,000 worth of cigarettes and proceeds back

12  to Long Island via a portion of I-78.  Fairchild received

13  approximately $1,000 per run.  Apparently, it wasn't too hard

14  to get cigarettes, was it?

15  A.  But that doesn't explain how they were obtained.  That just

16  explains that in a nutshell, I would drive down there and get

17  cigarettes.  I can tell you this though.  When the Dollar

18  Stretcher was open that was my first stop every time.

19  Q.  So, Mr. Fairchild, 50 trips in 2016 by July 10th, $20,000

20  of cigarettes per trip, 8 or 9 different stores, and it all

21  went downhill after the Dollar Stretcher closed?  Is that what

22  you're trying to tell this jury?

23  A.  No.  I'm just saying it got harder.  It was harder.  The

24  Newports were limited.  You had certain --

25  Q.  What you're saying is the Dollar Stretcher was --

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1          MR. STEIN:  Objection, Your Honor.  He's --

2  Q.  -- irrelevant to your operation --

3          THE COURT:  Hold on, Mr. Stone.  Mr. Stein.

4          MR. STEIN:  I object.  He has again cut off the

5  witness before he was finished.

6          THE COURT:  I think he asked him a yes or no

7  question, and then he kept going so --

8          MR. STEIN:  The witness is entitled to explain his

9  answer.

10          THE COURT:  He can explain his answer on redirect.

11          Mr. Stone, go ahead and ask your question over or ask

12  another question.

13  BY MR. STONE:

14  Q.  So I think we've established you were just doing fine

15  without the Dollar Stretcher; right?

16  A.  It took me longer without the Dollar Stretcher.

17  Q.  It took you longer?  You had made 50 trips --

18  A.  No, it took me longer --

19  Q.  -- by July 10, 2016, and you're saying that it took you

20  longer?

21  A.  To get the cigarettes.  You know, there was a -- to get the

22  cigarettes, it takes longer.  If you can get a hundred at one

23  stop and now you can't get that hundred --

24  Q.  So you're bringing back $20,000 worth of cigarettes, and

25  you can only buy them five at a time according to your

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   testimony.  So were you going to like a hundred stores in

2   Frederick County, Virginia?

3   A.  No.  You could buy -- some you could get 25 and some you

4   could get 5 and some you could get 10 and some you could get 5

5   Marlboros and 5 Newports and then 15 of other ones.

6   Q.  All right.  Now, when you got stopped on November -- so

7   July 10, 2016, you get popped, 300 cartons, and basically they

8   -- what did they give you?  A citation --

9   A.  No.

10  Q.  -- and let you go?

11  A.  They arrested me and then I was bailed out.  And then I --

12  the case finally settled with no probation.  Just a fine.

13  Q.  You just paid a fine?

14  A.  Yes.

15  Q.  And on -- for that trip, the Federal Government didn't try

16  to charge you with any of that; right?

17  A.  I wasn't indicted at that time.

18  Q.  All right.  And you didn't pay any taxes to Pennsylvania --

19  A.  Yes, I did.

20  Q.  -- or anything?  Huh?

21  A.  I paid -- there was restitution.  I paid -- they charged me

22  $5,000 just roughly.

23  Q.  Okay.  As a fine?

24  A.  That was the taxes that they -- they charged per carton.

25  Q.  Uh-huh.  So the state where you were actually stopped, they

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1    actually charged you --

2    A.   Yes.

3    Q.   -- for the taxes?

4    A.   Yes.

5    Q.   And you paid that --

6    A.   Yes.

7    Q.   -- and you paid a fine?

8    A.   Yeah.  There was a fine.  There was taxes per carton.

9    Yeah.

10   Q.   Okay.  And so you get indicted.  And we're talking November

11   or October 2017 you get indicted.  Your cigarette activities

12   continue unabated from July 2016 up into October 2017; correct?

13   A.   Yes.

14   Q.   All right.  So you're still running your business.  Still

15   going to eight or nine different stores.  Still buying $20,000

16   a week of cigarettes?

17   A.   Roughly, yeah.

18   Q.   All right.  And clearly you're not buying from the Dollar

19   Stretcher; right?

20   A.   The Dollar Stretcher was closed.

21   Q.   So on November 29th and 30th you talked to Mr. Stein,

22   Mr. Ellinger, and the officers investigating this case;

23   correct?

24   A.   Yes, I did.

25   Q.   And the main thing that they wanted to talk to you about

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1   was the Dollar Stretcher?

2   A.  No.  They wanted to talk about my activity in obtaining

3   cigarettes from the Winchester area.

4   Q.  Okay.  Well, I mean the Government gave us your -- the

5   narrative of what they talked to you about.  And the only store

6   that I see listed is the Dollar Stretcher.

7   A.  The other stores must have been playing by the rules.  I

8   don't know the exact laws in Virginia to sell cigarettes.  I

9   just knew that I needed to buy cigarettes that I could sell in

10  New York.  So if the store was telling me they would only give

11  me five, then I would just take five and leave.  If Reba was

12  willing to give me more, then I gladly took more and went on my

13  way.

14  Q.  I mean don't you think that it's shocking that the agents

15  didn't want to ask you about the eight or nine other stores --

16  A.  I don't --

17  Q.  -- of who you had been buying $20,000 per week of

18  cigarettes from September 2015 up until you got stopped on

19  November 29, 2017?  They didn't ask you about any of that.

20  They asked you about a store that had been closed since

21  September of 2015.

22  A.  I don't know the laws in the state of Virginia, but I

23  answered -- I told them what I told them.

24  Q.  You told them about one store that had been closed since

25  Labor Day 2015.  You didn't tell them about any other stores.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  They didn't even ask you.  I mean what kind of investigation --
2  A.  I don't know what to say.
3  Q.  -- are they doing?
4  A.  I don't know what you want me to say.  Like...
5  Q.  I mean didn't it shock you that --
6  A.  No.
7  Q.  -- you'd been running cigarettes for over two years after
8  that store closed, and they never thought about asking you
9  about any other stores even though you had told a trooper I
10  would go to 8 or 9 stores, $20,000 a week, this is my 50th
11  trip?  Sounds like you were making a hundred trips a year, and
12  they didn't even ask.
13  A.  When I spoke to that trooper that you keep bringing up, I
14  was -- I was in a situation so him and I talked.  And actually
15  to be honest, he told me what do you make?  A thousand a week?
16  So I said, yeah, I make a thousand a week.  I wasn't going to
17  sit there and paint the picture for him.  He had figured out
18  that this was something I was doing and so I said yeah.
19  Q.  All right.  Now, you ultimately testified before the grand
20  jury January 9, 2018, for this case; correct?
21  A.  Yes.
22  Q.  And so, you know, during a grand jury, Mr. Stein asks you
23  questions.  You answer questions.  Correct?
24  A.  In the grand jury, I don't think Mr. Stein was asking me
25  the questions.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  Q.  Okay.  Well, if I relate to you that the grand jury

2  transcript that we have indicates Mr. Stein asked the

3  questions, do you think that's inaccurate?

4  A.  I don't know.  On that day, I went to a courtroom filled

5  with people, and I gave testimony.  And if you're saying that

6  Mr. Stein asked those questions, I don't remember that.  I

7  don't know.

8  Q.  Mr. Fairchild, let me hand you this document and just ask

9  you if this refreshes your recollection of who was asking you

10  the questions.

11  A.  Yeah, this is -- it says Mr. Stein.  And then it has a

12  question.  Mr. Fairchild.

13  Q.  So does that refresh your recollection?

14  A.  Not really but okay.

15  Q.  All right.  Well, during the grand jury you're asked

16  questions about the Government's investigation, and you provide

17  information; correct?

18  A.  I gave them grand jury testimony about the cigarettes I got

19  in Virginia.

20  Q.  Okay.  Do you recall that during the grand jury, a grand

21  juror actually asked you a question?

22  A.  Yes.

23  Q.  So somebody -- do you recall that they asked you about

24  whether or not the people who were working in the store asked

25  you about what you were doing with these cigarettes?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   A.   If you have the question, can I see it?

2   Q.   Sure.   I'm going to hand you the portion of the transcript.

3   A.   Okay.   I read the question.

4   Q.   All right.   Does that refresh your recollection?

5   A.   I still can't remember the juror saying this.   And if

6   that's what I said and they have testimony, yeah.   I mean...

7   Q.   So you would agree that a grand juror asked you, "You said

8   you've done this for five years.   During that time, they didn't

9   ask you what you were doing with this large amount of

10   cigarettes you were purchasing?"

11       And your response, "We never really got into it.   I just

12   came, picked up cigarettes, and took them back to New York."

13   A.   I don't know what he meant by they never asked you.   Who is

14   they?

15   Q.   I presume the people you were testifying about during grand

16   jury.   So I'm presuming that would be Ms. Myers and

17   Ms. Lindquist because that's who you were questioned about;

18   right?   The Dollar Stretcher.   When you went to the grand jury.

19   A.   I was questioned on the testimony.   They asked me

20   questions.   I answered them.

21   Q.   All right.   And when you went --

22   A.   Like I said, I'm not a lawyer.   I don't -- you know, I

23   don't know how this works.   I never testified before.   I have

24   never been in front of a grand jury.

25   Q.   All right.   But we do know they didn't ask you about what

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   you were doing with cigarettes and who the retailers, the eight

2   or nine you told the trooper about, from September 2015 up to

3   November 29, 2017.  We know that; right?

4   A.   I mean -- I don't know what to say.

5   Q.   All right.  Also on your phone calls that you had no idea

6   were being intercepted, do you recall talking to one of your

7   friends around October 11, 2017?  Talking to them about

8   Mr. O'Connell.  The fact that he's going to appear pursuant to

9   a deposition and that he's going to rat you out and that you're

10  being charged with conspiracy.  I mean do you remember any of

11  that?

12  A.   Can I see what you're talking about?

13  Q.   So you don't remember?

14  A.   I spoke to a few people.  I don't know who you're talking

15  about but...

16  Q.   Do you ever remember telling your friends in New York --

17  A.   Like I said --

18  Q.   When your friend asked you about --

19  A.   Dennis had sold cigarettes to all of these individuals.  So

20  if he talked about it, it was because they knew Dennis

21  personally.

22  Q.   All right.  But do you recall answering a question for one

23  of your friends who asked you what's the conspiracy though, and

24  you said me and him; me and Dennis conspired?

25  A.   That gentleman -- that gentleman had asked me like what was

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  going on, and I just mentioned that Dennis and I were involved

2  in a conspiracy.  But I didn't pull out the charges and read

3  off all the --

4  Q.  Right.

5  A.  -- people.  He didn't know.

6  Q.  So you and a friend, somebody close to you, somebody I

7  presume who you trust enough to talk about the case, he asked

8  you what conspiracy, who conspired.  And you say me and him, me

9  and Dennis.

10  A.  Well, I didn't pull out --

11  Q.  That's what you said; right?

12  A.  I didn't pull out the sheet I got when I left court that

13  said this conspiracy between Lisa, Reba, John Fairchild.  To

14  mention Lisa and Reba, he don't know who they are.

15  Q.  You knew what your charges were.  You had been indicted.

16  You had gone to court.

17  A.  Yeah, I was involved in a conspiracy.

18  Q.  And when you told your friend after --

19  A.  I was involved in a conspiracy.

20  Q.  -- you had been indicted, after you had been arraigned, he

21  said who conspired?  You said me and him.  Me and Dennis.

22  Right?  You didn't say you and Reba or you and Lisa.  You said

23  me and him.  You and Dennis.  Right?  That's what you said?

24  A.  To be honest with you, I'm not exactly sure what I said

25  because I don't remember the question.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1          MR. STONE:  Your Honor -- well...

2  BY MR. STONE:

3  Q.  Mr. Fairchild, we're going to play an exhibit that was

4  provided to us by the United States referencing your recorded

5  phone conversations with your friends in New York and hopefully

6  this will refresh your recollection.

7          MR. STONE:  Your Honor, we're going to try to skip

8  ahead a little bit on this.

9          THE COURT:  All right.

10          MR. STONE:  It's I think about a ten-minute phone

11  call.

12          (Play audio.)

13          MR. STEIN:  (Indiscernible.)

14          THE COURT:  I'm sorry.  Hold on with the sound,

15  Mr. Beck.

16          MR. STEIN:  I'm sorry.  I thought there was going to

17  be a transcript.

18          MR. STONE:  No.

19          MR. STEIN:  Okay.  No objection.

20          THE COURT:  Okay.

21  BY MR. STONE:

22  Q.  All right.  Mr. Fairchild, what I'm going to play for you

23  to try to refresh your recollection, this is a phone call from

24  October 11, 2017, 8:12:02 A.M.  It was obtained pursuant to the

25  Suffolk -- I guess Suffolk County wiretap that they were doing

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1   on your phone.

2          THE COURT:  Mr. Stein.

3          MR. STEIN:  Your Honor, I would like to see the phone

4   call first.  (Indiscernible.)  I'd like to read it.

5          MR. STONE:  Ten eighteen.

6          MR. STEIN:  Ten minutes and eighteen seconds?  I'd

7   like to read it.

8          Your Honor, I think that we should be able to read

9   this before they play a ten-minute clip to see whether there

10  might be an objection for any number of reasons.

11         THE COURT:  Well, okay.  Because it's a ten-minute

12  clip, but you can probably read faster than that.  So go ahead

13  and read it.

14         How many pages is it, Mr. Stone?

15         MR. STONE:  It's not very long, Your Honor.

16         THE COURT:  Could you count them for me.

17         MR. STONE:  Let's see.  It is actually four pages and

18  maybe the third of another page.  Double spaced.  Probably four

19  pages total.

20         THE COURT:  Okay.  Take a look at it.

21         MR. BECK:  Your Honor, may I make a point of

22  clarification just so the Court understands?

23         THE COURT:  Yes, sir.

24         MR. BECK:  I think the actual talking is a lot less

25  than ten minutes because as I understand the way these wiretaps

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1    work is the police officers have to drop the audio down --

2              THE COURT:  Right.

3              MR. BECK:  -- if there's a discussion about something

4    that's not relevant to their investigation.

5              THE COURT:  Right.

6              MR. BECK:  So there is some down time on here, but I

7    guess the entire thing takes ten minutes to play.

8              THE COURT:  What we're going to hear is ten minutes

9    or you mean with the down time is ten minutes because there's

10   --

11             MR. BECK:  That's right.  The whole thing is ten

12   minutes but the down time --

13             THE COURT:  Okay.

14             MR. BECK:  -- may be five minutes or so here and

15   there.  It keeps going up and down.

16             THE COURT:  Okay.  So that's what you got in

17   discovery, Mr. Stone, from the Government?

18             MR. STONE:  Correct.

19             THE COURT:  Okay.

20             (Pause.)

21             MR. STEIN:  No objection, Your Honor.

22             THE COURT:  All right.  Thank you.

23   BY MR. STONE:

24   Q.  All right.  Again, Mr. Fairchild, this is October 11, 2017,

25   8:12:02 A.M.

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1      (Play audio.)

2          MR. STONE:  I think it resumes at 8:36 approximately.

3          THE COURT:  Counsel, do you want to speed it up to

4    where it picks up again or do you want that gap there?

5    Mr. Stein?

6          MR. STEIN:  Your Honor, at this point, they might ask

7    the witness whether his recollection is --

8      (Audio continued playing.)

9          THE COURT:  Well, hold on.  Let's stop and go

10   backwards, Mr. Beck, so we don't miss that.

11     (Stopped audio.)

12         MR. BECK:  I've stopped it.

13         THE COURT:  Mr. Stone asked to play it.  It's his

14   cross so we'll do what you want to do, Mr. Stone, with this.

15         MR. STONE:  Your Honor, we need to finish this.

16         THE COURT:  Okay.  Go ahead.

17         MR. STONE:  The relevant portion is towards the end.

18   But just so it's in context.

19         THE COURT:  Okay.

20         MR. STEIN:  Your Honor, may we approach?

21         THE COURT:  Sure.

22     (Bench conference commenced outside the hearing of the

23     jury.)

24         THE COURT:  Mr. Stein, he showed you the transcript

25   of this audio that he's playing.  You read it.  You should have

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   seen it before because it was provided to them in discovery.

2   And you told me you had no objection to them playing it.  So

3   why are we up here?

4           MR. STEIN:  Because there's a point past -- the

5   ostensible purpose was to refresh his recollection about who he

6   was talking to.  I think by this point, we when hit a gap, the

7   witness will remember who he was talking to and the rest of

8   this is just gratuitous.

9           MR. STONE:  No --

10          THE COURT:  Mr. Stone.  Go ahead.

11          MR. STONE:  Your Honor, the key provision is we

12  specifically asked him about who was involved in the

13  conspiracy.  He feigned as if he didn't recall.  So we're going

14  to refresh his recollection.  It's at the end of this

15  recording, but the whole thing needs to be heard to be put in

16  context.

17          THE COURT:  Well, and more importantly -- and I agree

18  with that.  More importantly, as well, you saw the transcript

19  and had no objection to it.  I think we're just wasting time up

20  here.  There was no objection.  I don't find it objectionable.

21  Go ahead and finish this, Mr. Stone.

22          MR. STONE:  Thank you.

23          THE COURT:  The objection is overruled.

24      (Bench conference concluded.)

25      (Continue playing audio.)

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1  BY MR. STONE:

2  Q.  So, Mr. Fairchild, after listening to that call, that's you

3  on the call; right?

4  A.  Yes, that is me.

5  Q.  And who are you talking to?

6  A.  This guy Al.

7  Q.  All right.  And Al is someone you trust enough to discuss

8  your personal business; correct?

9  A.  I told everybody my personal business since I was 10 years

10  old.

11  Q.  All right.  And he asked you what's the conspiracy, and you

12  said me and him conspired; right?

13  A.  That's what I said.

14  Q.  In your own words, after you got indicted, October 11, 2017

15  --

16  A.  Was my --

17  Q.  -- the conspiracy is you and him conspired.

18  A.  But I also told him there was a 15-page indictment so I --

19  I abbreviated.  I don't know what to tell you.  I mean I'm not

20  a lawyer.

21  Q.  You've told us.

22  A.  I'm not a lawyer.  He asked me what the conspiracy is.

23  Q.  And you told him me and him conspired.

24  A.  I didn't read the indictment to him.  No, I didn't.  The

25  indictment wasn't read.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   Q.  All right.

2   A.  I'm not a lawyer.  I don't know.

3   Q.  Oh, I know.

4   A.  I mean I'm not a lawyer.  I'm a criminal.  My whole life.

5   I broke the law.

6   Q.  All right.  Now, did the Government or did your lawyer let

7   you know that in addition to tapping your phone, they also had

8   all your text messages?  Did they tell you that?

9   A.  Did the Government tell me that?

10  Q.  Yeah.  Did the Government -- did Mr. Stein or Mr. Ellinger

11  when they were meeting you doing your trial preparations, did

12  they let you know that they had all your text --

13  A.  They --

14  Q.  -- messages during this wiretap too?

15  A.  A wiretap, yeah.

16  Q.  All right.  So they --

17  A.  But I don't know how they would get my text messages.  I

18  don't -- I don't know how the wiretap works.  I don't know.

19  There was an investigation in New York against me that

20  coincided with this.  So I don't know what else to tell you.

21  New York arrested me.  Virginia arrested me.  They all got me.

22  I retired.

23  Q.  All right.

24  A.  Trying to make a new life.

25  Q.  All right.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   A.  Is that okay?

2   Q.  I mean I hope so.

3   A.  You make mistakes; right?  I made mistakes.

4   Q.  It sounds like based upon that phone call, you've got a

5   real aversion towards people who rat and cooperate.

6            MR. STEIN:  Your Honor, this an argumentative.  It's

7   not a question.

8            THE COURT:  Mr. Stone, was that a question?

9            MR. STONE:  I'm just asking him about what was on

10  that audio, Your Honor.

11           MR. STEIN:  He wasn't asking at that point what was

12  on the audio.  He was -- he was just going on in terms of the

13  argument that he was having about what Mr. Fairchild was doing.

14           THE COURT:  Sustained.  I think it was a comment.  If

15  you have a question, Mr. Stone, ask it.

16           MR. STONE:  Yes, Your Honor.

17  BY MR. STONE:

18  Q.  Now, Mr. Fairchild, your cigarette operation changed a

19  little bit in the -- I guess the summer and the fall of 2017;

20  correct?

21  A.  What do you mean changed?

22  Q.  Well, your method of transportation to get to Virginia.  At

23  that time, you didn't just drive down; right?

24  A.  No.

25  Q.  You started flying down?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  A.  Sometimes I would take a flight.

2  Q.  All right.  So you would take a flight from where?

3  LaGuardia?

4  A.  From JFK.

5  Q.  From JFK.  And then would you fly to Dulles?

6  A.  To Dulles.

7  Q.  And then what?  You'd rent a car?

8  A.  I would rent a car.

9  Q.  And then you'd go get your cigarettes, and then you would

10  drive more?

11  A.  Yes.

12  Q.  And in actuality, you apparently befriended someone who you

13  put to work and whomever that someone was would go buy all the

14  cigarettes for you and then have them ready for you when you

15  got to Winchester; correct?

16  A.  When -- like I said, when the Dollar Stretcher closed and

17  that everybody -- all the other stores were raided, yeah, it

18  got tougher.  That's what I was saying.  It got tougher.  It

19  got real tough.

20  Q.  Well, I'm asking you about October 2017.

21  A.  And that's after the raid and the Dollar Stretcher closed

22  so it was tougher way before that.

23  Q.  But somehow you were getting through?

24  A.  I'm very persistent.  I, you know, do what I had to do.

25  Q.  Somehow those 8 or 9 other retailers made it to where you

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   could buy your 20,000 a week; right?

2   A.  Not really.  There was other people involved at that point.

3   Q.  All right.  So --

4   A.  It wasn't easy like that.  It wasn't --

5   Q.  Who was the person that you were able to convince to buy

6   your cigarettes in Winchester in October of 2017?

7   A.  It was a friend that used to work at the dollar -- one of

8   those cigarette stores.

9   Q.  Okay.  So what was your friend's name?

10  A.  Liberty.

11  Q.  And what was your arrangement with Liberty?

12  A.  I paid her rent.

13  Q.  So you paid her money and then she --

14          MR. STEIN:  Objection.  This is well beyond the scope

15  of the cross -- of the direct examination and completely

16  irrelevant to this case.

17          THE COURT:  Mr. Stone.

18          MR. STONE:  Well, Judge, the Government -- he claims

19  that his business basically shut down after the Dollar

20  Stretcher closed.  And clearly this evidence impeaches that.  I

21  think it's relevant and material, and I think I should be able

22  to question him.  I'm almost done.

23          MR. STEIN:  I think that's a mischaracterization,

24  Your Honor.  The witness testified it got harder.  He never

25  said anything about it shutting down.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1          THE COURT:  Overruled.

2    BY MR. STONE:

3    Q.  So this person's name is Liberty?

4    A.  Yes.

5    Q.  What's Liberty's last name?

6    A.  I don't know.

7    Q.  You don't know?

8    A.  No.

9    Q.  You're under oath.  You're supposed to be testifying to the

10   truth.  You got a --

11   A.  I don't remember her last name.

12   Q.  -- cooperation agreement --

13   A.  I don't remember her last name.  I mean if I look at my

14   phone, I could probably remember.  I just don't remember.  I

15   don't remember the guy's on the phones last name.

16   Q.  All right.

17   A.  I barely remember Michael Stein's last name.  I don't -- I

18   don't know what to tell you.  I've been through hell and back.

19   I can't remember everything.  Like does that make me a bad guy?

20   Q.  How are you so able to remember everything you did at the

21   Dollar Stretcher then, Mr. Fairchild?

22   A.  Because it was my first trip.  I would go to the Dollar

23   Stretcher, and then she would give me 50 Newports, and then she

24   would give me 25 Marlboros and 25 Marlboro Lights.  And then

25   that would -- that would set my trip.  And then I would go from

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1  there, and I would get five here.  Sometimes I would get two.

2  And then I would just keep on clawing my way to the number.

3  Whatever I had enough money to buy.  I don't -- I don't know

4  what you want me to tell you.

5  Q.  So this person --

6  A.  That was the start.  The Dollar Stretcher was the start.  I

7  would start there.  I would get enough Newports where I could

8  just get five more here and five more there.

9  Q.  So this person, Liberty -- you would actually somehow get

10 your money to Liberty in Frederick County, Virginia so that

11 Liberty could buy your cigarettes; correct?

12 A.  Yes.

13 Q.  And you didn't even know Liberty's last name, but yet

14 you're buying $20,000 a week of cigarettes?

15 A.  She wouldn't buy 20,000.  She would buy maybe 50 of them.

16 She wouldn't -- half the time, I didn't have the money to give

17 to her to get them.

18 Q.  All right.

19 A.  Because she can't buy them on her good looks.  She needed

20 the money.  And the money -- I didn't get the money until

21 Friday.  So on Sunday I had to go do what I had to do.

22 Q.  All right.  So Liberty's last name unknown.  Somehow you

23 would get your money to her even though you didn't know her

24 last name.  And you trusted --

25        MR. STEIN:  Your Honor, I object.  He's

JOHN FAIRCHILD – CROSS EXAMINATION BY MR. STONE

1  mischaracterizing the evidence again.  The witness clearly said

2  he doesn't remember her last name.  Not that he didn't -- that

3  it's an unknown thing.  He said he forgot it.  He said he

4  almost forgot my name.  And he went on and explained his

5  forgetfulness.  And for counsel to say that he testified to

6  something else is just incorrect.

7            THE COURT:  Mr. Stone.

8            MR. STONE:  Your Honor, I mean I don't even know what

9  I could ask him anymore.  I seems as if he can't remember

10  anything.  So I'll move on.

11            THE COURT:  All right.  Thank you, Mr. Stone.

12  BY MR. STONE:

13  Q.  Mr. Fairchild, did Reba Myers or Lisa Lindquist ever assist

14  you in transporting cigarettes that you purchased in Virginia

15  outside of the state of Virginia?

16  A.  No.

17  Q.  Did Reba Myers or Lisa Lindquist ever assist you in

18  redistributing your cigarettes in New York or any other

19  location?

20  A.  No.

21  Q.  After you sold your cigarettes and made whatever your

22  profit was, did Reba Myers or Lisa Lindquist receive a cut of

23  your profit?

24  A.  I used the money to buy more cigarettes from them, but I

25  don't --

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. STONE

1   Q.   Did they receive a cut of your profit?

2   A.   No.   I just came back and bought more from them.

3   Q.   So they did not receive a cut of your profit?

4   A.   Well, the profits were used to buy more cigarettes from

5   them so I don't know what that means but...

6   Q.   Again, Mr. Fairchild, this is a simple question.

7           MR. STEIN:   Asked and answered, Your Honor.

8   BY MR. STONE:

9   Q.   If you made --

10          MR. STEIN:   I object.   It's been asked and answered.

11          MR. STONE:   Your Honor, it's nonresponsive.

12          THE COURT:   He didn't ask his question yet.

13  BY MR. STONE:

14  Q.   Mr. Fairchild --

15          THE COURT:   And it's on cross.   If it's asked and

16  answered, he's able to ask the same question again on cross.

17  So overruled.

18  BY MR. STONE:

19  Q.   Of the $10 you claim you made on the cigarettes that you

20  were buying in Virginia when you redistributed them in

21  New York, out of every $10, did you give Ms. Myers or

22  Ms. Lindquist a cut, a percentage?   Did they get $3 out of

23  your --

24  A.   No.

25  Q.   -- every 10?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   A.   No.

2   Q.   Because they're not part of your operation.

3   A.   I don't know what you want me to say to that.  I don't have

4   -- I don't know that.  How would I answer that?  I bought the

5   cigarettes from the Dollar Stretcher.

6           MR. STONE:  No further questions, Your Honor.

7           THE COURT:  Mr. Beck.

8           MR. BECK:  Thank you, Your Honor.

9                   CROSS EXAMINATION

10  BY MR. BECK:

11  Q.   All right.  Mr. Fairchild, my name is Barry Beck; and I

12  represent Lisa Lindquist.  I want to talk to you about this

13  statement that you gave to Mr. Stein and Mr. Ellinger right

14  after you were arrested in November of 2017 for continuing to

15  traffic in cigarettes.  You remember talking to them about your

16  friend, Adam?

17  A.   Yes.

18  Q.   Okay.

19  A.   I wouldn't call him a friend.

20  Q.   Well, let's say a former associate.

21  A.   He went to get cigarettes for me on several occasions and

22  robbed me one time, too, but whatever.  He's not a friend.

23  Q.   Do you remember telling them that Adam made ten buying

24  trips for you?

25  A.   Sounds about right.  Yes.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  Q.  Ten.  That's what you told them; right?

2  A.  If that's what's in the testimony, yeah.  Then --

3  Q.  Would you like me to show it to you?

4  A.  Sure.

5  Q.  Because you initialed -- apparently what happened was they

6  typed this up, and you initialed it as being correct or not.

7  And you can ignore my highlighting on the second page.  That

8  was not part of the original.  And what I just asked you about

9  is on the first page.

10  A.  Is this where it says he personally bought cigarettes about

11  once every ten days?

12  Q.  No.  Read it carefully.  It says Adam made ten buying trips

13  for me.  You don't see that?

14  A.  Yeah.  Adam made ten buying trips to Virginia.

15  Q.  And you initialed this thing to correct some other things

16  that were written that weren't correct, but you did not initial

17  that, did you?

18  A.  No.

19  Q.  You didn't change that?

20  A.  No.

21  Q.  Okay.  And you told Mr. Stein and Deputy Ellinger that the

22  reason he stopped making trips for you is because he was

23  stealing from you or cheating; correct?

24  A.  One time he didn't come back with any.  He lied to me and

25  stole my money.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  Q.  Okay.  So that's how the relationship ended?

2  A.  That's how it ended.

3  Q.  All right.  So let me paint the chronology if I can of how

4  this statement came about.  You get arrested -- well, first of

5  all, you get indicted in October of 2017 in this case.  You

6  continued to run your business.  And in November of 2017, they

7  catch you in West Virginia with all those cigarettes, and they

8  bring you to the barracks.  And apparently you got five or

9  six -- well, three agents there, including Deputy Ellinger.

10  You got Mr. Stein there.  And you know you're in a big problem

11  then, don't you?

12  A.  Yes.

13  Q.  Okay.  And not only do you know this -- not only do you

14  know you've already been indicted for doing stuff in the past,

15  you know that you just did more stuff; right?

16  A.  Yes.

17  Q.  So you're in a world of trouble right here; right?

18  A.  I was in a situation that I knew was very bad.  And when

19  you say world of trouble, I think of a terminally disease.  I

20  mean it's cigarettes.  It's not guns.  It's not heroin.  So

21  when you say world of trouble, I don't --

22  Q.  Well, it's just a manner of speaking.

23  A.  I mean world of trouble is like --

24  Q.  It was not a bad --

25  A.  World of trouble I just murdered somebody.  I'm never

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   getting out of jail.  I mean that's world of trouble.

2   Q.  You were in a bad spot, weren't you?

3   A.  I was in a bad spot.

4   Q.  A very bad spot.

5   A.  I was in a bad spot.

6   Q.  Okay.

7   A.  I was in a bad spot.  It wasn't my best day.

8   Q.  And at that time, you decided to be a rat?

9   A.  At that time, I explored the options available to me and

10  felt that putting this behind me and doing the right thing was

11  to benefit me the most.

12  Q.  And at that time, you knew that somebody else who had been

13  charged in your case was Lisa Lindquist; right?

14  A.  Yeah.

15  Q.  And you knew that they wanted to prosecute and convict Lisa

16  Lindquist, didn't you?

17  A.  I knew it was a case against all of us.  What they were

18  doing, I don't -- I don't know what their motives are.  I just

19  knew there was a case against us.

20  Q.  Well, they wouldn't have prosecuted her if they didn't want

21  to convict her; right?

22  A.  I mean they arrested us all so...

23  Q.  Okay.  And you were there trying to help yourself by

24  talking to them; right?

25  A.  I was just trying to do the right thing.  I had lived a

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  life of crime up to that point, and I was trying to take a

2  different path.

3  Q.  Once you got caught again?

4  A.  Yeah.  Well, isn't that the way it always works?  Right?

5  When the shit hits the fan, you figure out what you're going to

6  do to clean it up?

7  Q.  Well, most people would have done that once they got

8  indicted, but I guess it didn't work for you.

9  A.  Well, I'm not most people.  I don't know what to tell you.

10  Q.  Okay.

11  A.  My awakening came on November 29th.

12  Q.  All right.  So you meet with them, and you tell them -- you

13  answer their -- you ask questions, and Mr. Stein said they

14  didn't ask you anything except for about Dollar Stretcher;

15  right?  That's what it says?

16  A.  I mean --

17  Q.  We already went through that.

18  A.  Okay.

19  Q.  Okay.  And in that statement and you said here today --

20  well, first of all, you said here today your routine was to

21  come from New York to West Virginia on Wednesdays and Sundays;

22  correct?

23  A.  Me or somebody that was getting them for me.  Adam, Dennis.

24  Q.  That was the routine?

25  A.  The routine was to get cigarettes from Virginia twice a

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  week on Wednesday and Sunday.  Sometimes by me.  Sometimes by

2  other people.  That was the routine.

3  Q.  And then today and in your statement when you were meeting

4  with the police after you had been caught, after you had been

5  indicted, they asked you how many times did you deal with Lisa

6  Lindquist; right?

7  A.  Yeah.  I guess we talked about that.

8  Q.  Okay.  Well, the memo says you did.

9  A.  Okay.

10  Q.  But today you said something to the effect that -- and I'm

11  not sure I understand the math, but you said 90 percent of the

12  time -- let me just read it -- 90 percent of the time either

13  Reba or Lisa were there.  And then you said 75 percent of the

14  time Reba was there, and 75 percent of the time Lisa was there.

15  I don't understand that math, but I guess what you were trying

16  to say -- what were you trying to say?

17  A.  Nothing.  Just when I bought cigarettes from the Dollar

18  Stretcher, one of them were there.

19  Q.  Okay.  Did you know -- did you know the Dollar Stretcher

20  keeps or had kept records of who worked every day of the week

21  and -- did you know that?

22  A.  No, I --

23  Q.  It wouldn't surprise you, would it?

24  A.  I don't know how the Dollar Stretcher run their business.

25  Q.  Would it surprise you to know that according to the records

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   -- and they've been looked at; you've never seen them so I'm

2   not going to ask you to look -- that Lisa Lindquist did not

3   work on Sundays?

4   A.   Okay.  She didn't work on Sundays.

5   Q.   So you couldn't have seen her then; right?

6   A.   No.  But half the time I wasn't even the one going.

7   Q.   So you don't know who was there when the other people went

8   then; right?

9   A.   Dennis would say he seen Reba.

10  Q.   Okay.  But you don't know whether they saw Lisa?

11  A.   He would tell me how the trip went.  He would say all

12  right, you know.  He'd call me and give me a report.  I went

13  there.  I got a bunch there.  Then I got the rest here.  And I

14  got the rest there.

15  Q.   Okay.  Well, my point is though you could not have -- if

16  these records show that Lisa didn't work on Sundays, then you

17  didn't see her on Sundays; right?

18  A.   Then she didn't work on Sunday.

19  Q.   All right.  Now, also you looked at a couple of exhibits.

20  Government Exhibit 4-B.

21       MR. BECK:  Chad, could I have that, please?

22  BY MR. BECK:

23  Q.   This is the text messages that Mr. Stein showed you.  Which

24  by the way, they seized your phone; right?

25  A.   West Virginia seized my phone.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   Q.  Okay.  Are you aware that there was never any

2   communications on your phone between you and Lisa Lindquist?

3   A.  Okay.

4   Q.  All right.  You don't disagree with that; right?

5   A.  No.  If that's what you're saying.

6   Q.  Well, you don't -- you didn't have any, right, with her on

7   your phone?

8   A.  I guess not.

9   Q.  Okay.  And on Exhibit 4-B, there was a communication on

10  October the 20th of 2013 that occurred at 1:03 P.M.  If these

11  records show that Lisa did not work that day, you couldn't have

12  seen her then either; correct?

13  A.  No.  If she didn't work, I wouldn't have seen her.

14  Q.  Okay.  Now, Mr. Fairchild, you had some conversations in

15  that video -- audio we played with your friend about hoping

16  that Mr. O'Connell would die and die soon; right?

17  A.  He was sick, and I said that.

18  Q.  Right.  And you called him a little "B" word?  You called

19  him that, didn't you?

20  A.  I called him some very harsh names, yes.

21  Q.  Okay.  And you had conversations with other people, too,

22  during this timeframe, other friends, where you discussed what

23  you hoped would happen to Mr. O'Connell; right?

24  A.  I mean I'm an open book.  So if something is on my mind,

25  yeah, we talked.

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  Q.  You remember telling people that he should go to the

2  hospital and tell them his F-ing chest is bothering him and try

3  to get out of the deposition that way?

4  A.  Yeah.  That's what we testified earlier.

5  Q.  And you remember saying that you hoped his car crashed on

6  the way to the deposition?

7  A.  Did I say that?

8  Q.  Well, I read it.  Yeah.

9  A.  All right.  Then I said it.

10 Q.  Okay.  And do you remember one friend of yours talking to

11 you, and you said something about -- well, it was right after

12 the car crash comment.  You said -- well, your friend said have

13 Lance see him.  And you said, huh?  And he said, yeah, tell him

14 -- who -- was he suggesting that you have somebody go -- who is

15 this Lance?

16 A.  Lance was a mutual friend of somebody else.

17 Q.  Is he a guy that would put a hurtin' on Mr. O'Connell if

18 you asked?

19 A.  No.

20 Q.  Okay.  What was he asking?  What did he mean by, if you

21 know, have Lance go see him?

22 A.  I don't know what he meant by that.

23 Q.  Okay.

24 A.  I don't know.  He said it.  I didn't.

25 Q.  Well, it was your friend.  You don't have any idea what he

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  meant?

2  A.  No, I don't know what he meant by that.

3  Q.  Okay.  So you make all these comments over these wiretaps

4  that you didn't know were being recorded?

5  A.  No.  It was a wiretap.  I didn't know.

6  Q.  And you were being wiretapped by police officers in New

7  York; correct?

8  A.  I was upset.  I mean my ways of earning money had just come

9  to an end, and I was scared.  I didn't know what I was going to

10  do from that point forward.

11  Q.  Sure.

12  A.  And for the past year, it hasn't been easy so --

13  Q.  And at some --

14  A.  I'm just --

15  Q.  I'm sorry.  I'm sorry.  Go ahead.  Finish.

16  A.  I'm just a cigarette bootlegger trying to find my way.  I

17  made a lot of mistakes.  I said a lot of nasty things.

18  Q.  And at some point, you got a call -- or a call or an email

19  or communication either from Mr. Stein or Deputy Ellinger or

20  one of the other agents saying if you make any more efforts of

21  contacting Mr. O'Connell, we're going to do something; right?

22  A.  Yeah.  I wasn't to talk to him.

23  Q.  Okay.  And so after -- then comes the date you're arrested

24  later on here in November.  After that arrest, you signed a

25  plea agreement; right?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   A.   Yes.

2   Q.   And in that plea agreement, you agreed to plead guilty to

3   some of the charges in this case?

4   A.   I pled guilty to conspiracy to traffic contraband

5   cigarettes.   Two charges.

6   Q.   That's right.

7   A.   I pled guilty to them both.

8   Q.   You have never --

9   A.   The charges in this indictment, I pled guilty.

10  Q.   You have never been charged with attempting to obstruct

11  justice, have you?

12  A.   No, I wasn't.

13  Q.   And you have never been charged with attempting to

14  intimidate Mr. O'Connell, have you?

15  A.   No, I haven't.

16  Q.   Now, you also have some problems in New York, too, don't

17  you?

18  A.   I don't think they're really problems.

19  Q.   Well, you consider being indicted not a problem?

20  A.   Well, because the case is -- gambling is legal now in the

21  federal system.   They shot it down.   And the D.A. that was

22  handling the case quit, and the new D.A. won't even get back to

23  my lawyers about plea bargains.   So I don't -- New York, no,

24  it's not a problem.

25  Q.   Well, you -- it's not a problem you're under indictment in

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1    New York?

2    A.  No because I'm trying to plead, and they won't let me.  The

3    D.A.s -- they won't even call my lawyer.

4    Q.  But it's not resolved yet, is it?

5    A.  Some of the people are resolved.

6    Q.  You're under a felony indictment in the state of New York;

7    correct?

8    A.  No, I don't think it's a felony.

9    Q.  You don't?

10   A.  It's never been -- it's never been -- I'm not a lawyer.  I

11   was charged with a crime, but it's not felony because I'm not

12   going to Riverhead Court.  It's in Central Islip.

13   Q.  Well, isn't that what all these undercover recordings were

14   about?  Isn't that what led to you being --

15   A.  Yeah, but when it's a felony, they send it to Riverhead.

16   Q.  So you're thinking that the New York State police up there

17   went through all the trouble to do these wiretaps and --

18   A.  It was the district attorney's office.

19   Q.  Well, you think they went to all that trouble just to

20   charge you with a misdemeanor --

21   A.  I mean my --

22   Q.  Let me finish my question, sir.  You think they went to all

23   that trouble to do these wiretaps -- I mean there's --

24   apparently aren't the easiest things -- all that trouble just

25   to charge you with a misdemeanor?

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1         MR. STEIN:  I object, Your Honor.  He's calling for
2    speculation from this witness of the district attorney's
3    charging decisions.
4            THE COURT:  Mr. Beck.
5            MR. BECK:  I'll withdraw the question, Your Honor.
6            THE COURT:  All right.
7            MR. BECK:  I'll withdraw it.
8    BY MR. BECK:
9    Q.  And you signed a plea agreement though with Mr. Stein and
10   the Government; correct?
11   A.  Yes, I did.
12   Q.  And in that plea agreement, they've offered or they've
13   suggested that you might get some relief in your case depending
14   on how you cooperate; isn't that correct?
15   A.  There was no guarantees.  It was said to me that if I
16   cooperate and tell the facts that I remember them best that
17   maybe at the end -- maybe at the end that it could help me.
18   But it wasn't discussed on how it could help me.  How much it
19   could help me.
20   Q.  Well, isn't it a fact that your understanding is that if
21   they're sat --
22   A.  If --
23   Q.  Let me finish the question, sir.  If they're satisfied with
24   your performance, Mr. Stein can get up at a later date and say
25   to this Court give him a sentence less than he would otherwise

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1  get?  Isn't that exactly the way it works?

2  A.  It is my understanding that at the end of the day, this is

3  all going to come down to what the judge thinks about the case.

4  Not what Mr. Stein does.

5  Q.  That's not what I asked you.  I know the judge has the

6  final call.

7  A.  No because in a federal system, there's a score.  And I

8  don't do -- I don't score very well on the system.  I made a

9  lot of mistakes in my life.  I was raised on my own since ten.

10 I committed a lot of crimes.  So now when you're in a federal

11 system, there's a scoring, and they score it.  And based on

12 your priors that's the scoring.  So --

13 Q.  Okay.  Let me try the question one more time.  Okay.

14 Because you're either not understanding or you don't want to

15 answer it.

16 A.  No, I don't understand.

17 Q.  You understand that this plea agreement, if the Government

18 feels that you've cooperated to their satisfaction, that they

19 will hopefully -- you hope that they will come in here and say,

20 Judge, we would like you to go easy or give him a lesser

21 sentence because he helped us?  That's true, isn't it?  Come

22 on.  I mean just say yes or no.

23 A.  No, but I don't understand why you're trying to make me say

24 that.  I cooperated.  And whatever is going to be the end

25 result is the end result.  Like I don't have any control over

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   this anymore.

2   Q.  Are you hoping --

3   A.  As of November 29th that's it.  I don't sell cigarettes.

4   I'm a cooperating witness.  And I'm here testifying to you.

5   Like I don't know what else you want me to say.

6   Q.  I just want you to answer the question.  You're hoping that

7   at the end --

8   A.  I don't know what he can do.  I don't really know what he

9   could do to be honest with you.  I don't know what -- at this

10  point, I don't know anything.  All I know is that I'm here

11  cooperating; and in the end, I'm going to be sentenced.  And

12  whatever the sentence is, is what I got to deal with.

13  Q.  Let me -- can I show you your plea agreement.  Maybe this

14  will cut it --

15  A.  Sure.  Show me whatever you want.

16  Q.  Look at paragraph 6 of your plea agreement, sir.  Would you

17  read it.

18  A.  If, in the sole opinion of the United States Attorney, the

19  defendant has provided substantial assistance in the

20  investigation or prosecution of another person while -- who has

21  committed an offense, the Government will file a Section 5K1

22  motion for sentencing guidelines reduction.

23  Q.  A sentencing reduction; right?

24  A.  Okay.

25  Q.  So in the sole discretion of Mr. Stein and the Government

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   as to whether or not you've cooperated, you might get a

2   sentencing reduction.  Is that a fair statement?

3   A.  Yes, it's fair.

4   Q.  Okay.  All right.  That's all I was trying to get out of

5   you, sir.

6   A.  But I'm not a lawyer.  Like I don't know what that means.

7   I don't know Section 5K1.  I don't know.

8   Q.  Well, you know what a sentencing reduction is, don't you?

9   A.  It sounds like you'll have less of a sentence.

10          MR. STEIN:  Your Honor --

11  BY MR. BECK:

12  Q.  Yeah, it's common sense.

13          MR. BECK:  I'm sorry.

14          THE COURT:  Hold on, Mr. Beck.

15          MR. STEIN:  It's mischaracterizing the cooperation

16  agreement in that he's talking about a 5K1, and this witness is

17  not eligible for a 5K and can never get a 5K.  And so that he

18  is suggesting -- and the witness doesn't know what he's talking

19  about so -- the witness has said he doesn't know, and that in

20  the end it is up to the Court.  That's his understanding.

21          THE COURT:  Why is it in the plea agreement if he's

22  not eligible?

23          MR. STEIN:  The 5K1, it's a boilerplate agreement

24  that the option is open if he earns it.  In this case, you have

25  to do several things to earn a 5K1 which involves a level of

JOHN FAIRCHILD - CROSS EXAMINATION BY MR. BECK

1   cooperation that this witness is not capable of.  And,

2   therefore, he is not eligible to get a 5K1.  The United States

3   Attorney will not recommend a 5K1.  He has never been promised

4   a 5K1.  And the witness is not mischaracterizing his testimony.

5   He's just testifying what it is.  And for Mr. Beck to keep

6   coming back and say the Government has agreed to do this for

7   you -- it's a may, if in the sole discretion of the United

8   States he has qualified for 5K1, and he can't qualify for it.

9              THE COURT:  May I see that plea agreement?

10             MR. BECK:  Yes, Your Honor.

11             THE COURT:  What paragraph are you on, six?

12             MR. BECK:  I believe it's paragraph six, Your Honor.

13             THE COURT:  Mr. Beck.

14             MR. BECK:  Yes, Your Honor.

15             THE COURT:  Response to the objection, and I'll hand

16   this back to you.

17             MR. BECK:  Well, Your Honor, all I'm going on is the

18   piece of paper that I was provided in discovery.  And if

19   there's been another decision by the U.S. attorney that says

20   he's not going to possibly get this, then I haven't seen it.

21   And I'm just -- I'm just reading plain English, Your Honor, and

22   I think this gentleman can understand it too.  I mean I don't

23   --

24             THE COURT:  The objection is overruled.  He signed

25   it, and that's what it says.

JOHN FAIRCHILD – REDIRECT EXAMINATION BY MR. STEIN

1  BY MR. BECK:

2  Q.  So let's just finish this, Mr. Fairchild, with this.  Do

3  you agree that in your plea agreement it says, quote, in

4  paragraph 6, "If, in the sole opinion of the United States

5  attorney the defendant has provided substantial assistance in

6  the investigation of prosecution of another person who has

7  committed an offense, the Government will file a Section 5K1.1

8  motion for a sentencing guidelines reduction"?

9      Do you agree with that statement?

10  A.  I mean what do they mean by substantial?  Like I don't --

11  what is it?  I don't know.  I don't know.

12          MR. BECK:  That's all the questions I have, Your

13  Honor.

14          THE COURT:  Redirect?

15          MR. STEIN:  Yes.

16                   REDIRECT EXAMINATION

17  BY MR. STEIN:

18  Q.  Mr. Fairchild, would you look at paragraph 3 of the plea

19  agreement.

20  A.  Yes.

21  Q.  And just look at it and tell me whether it involves

22  requiring you to cooperate.

23  A.  Yes.  It says the defendant will fully cooperate with the

24  office of the United States Attorney and any law enforcement

25  worker working with the United States Attorney Office.

JOHN FAIRCHILD - REDIRECT EXAMINATION BY MR. STEIN

1  Q.  And I'll take that back.  And at the time the plea

2  agreement -- you went into it, you were represented by counsel?

3  A.  Yes.

4  Q.  And did your lawyer talk to you about what you had to do in

5  terms of cooperating and telling the truth?

6  A.  We never had the conversation.

7  Q.  All right.  But was -- did -- was it your understanding

8  that the United States Attorney's Office could test your

9  credibility by even forcing you to take a polygraph if you

10  wanted to?

11  A.  I'm sure, yes.

12  Q.  And what have you been told relative to cooperation?  What

13  have you been told would happen to you if the United States

14  Attorney's Office believed you lied?

15  A.  I would be in a lot of trouble and the deal would be -- the

16  deal would be gone.

17  Q.  And did I -- has it been explained to you what would

18  happen if you told a lie that was not against the defendant --

19  I'm sorry -- that was against the defendant and, therefore,

20  in the Government's interest if we found out you lied about

21  that?

22  A.  Yes.

23  Q.  What would happen?

24  A.  That would be -- the agreement would be gone.  I can't lie

25  in anything against -- or just can't lie.

JOHN FAIRCHILD - REDIRECT EXAMINATION BY MR. STEIN

1  Q.  And were you ever expecting any substantial benefit other

2  than being able to tell the Court that you have now come clean

3  and hope that the Government would tell the Court that in our

4  opinion you testified truthfully, but that we were going to

5  leave the sentencing to the discretion of the Court?

6          THE COURT:  Before you answer that, counsel, can you

7  all approach?

8      (Bench conference commenced outside the hearing of the

9      jury.)

10          THE COURT:  I thought that we had received a motion

11  to continue Mr. Faircloth's sentencing from Mr. Manford.  And

12  the basis of it, which often is in this sort of situation, is

13  because the defendant is hoping that the Government will agree

14  to make sentencing recommendations under 5K1.  That's in this

15  motion as well.  So as an officer of the Court, you're telling

16  me that --

17          MR. STEIN:  I think --

18          THE COURT:  -- that's not on the table?

19          MR. STEIN:  Yes.  I think that Mr. Manford filed a

20  boilerplate motion and that 5K is not on the table.  It is a --

21  this case is a standard cooperation agreement case.  He is not

22  going to want to work undercover for us.  He is not going

23  to wear a wire.  It's a standard -- it's a standard cooperation

24  where we tell you what -- we believe he told the truth and

25  cooperated and ask you to give that whatever consideration you

JOHN FAIRCHILD - REDIRECT EXAMINATION BY MR. STEIN

1   believed.

2            THE COURT:  So it was never discussed with

3   Mr. Manford and this defendant through Mr. Manford that he

4   would be eligible for -- that the Government may file a 5K1?

5            MR. STEIN:  I think that -- as I recall that after --

6   I did -- this is not a joint motion, but I think it's one that

7   says I don't oppose.

8            THE COURT:  Right.

9            MR. BECK:  It says --

10           (Simultaneous speech.)

11           MR. STEIN:  Oh, did it?  Well, I think if you call

12   Craig Manford, he will tell you that I told him that when I did

13   see it, whoops, this isn't a 5K.  This is a standard agreement.

14   And -- because it's simply not.

15           THE COURT:  Well, I just wanted to bring this to

16   everyone's attention before this defendant answered your

17   question.  I don't want him to be led into answering --

18           MR. STEIN:  Well, I'm --

19           THE COURT:  Giving an answer that may not be --

20           MR. STEIN:  -- not leading.  I'm asking what his

21   understanding of his plea agreement is.

22           MR. STONE:  Judge, it's also problematic --

23           THE COURT:  I can't hear you, Mr. Stone.

24           MR. STONE:  It's problematic that the Government

25   would state during an objection that you're not eligible for a

JOHN FAIRCHILD - REDIRECT EXAMINATION BY MR. STEIN

1    5K.

2              MR. STEIN:  Well, that only goes to their benefit.

3    I'm saying don't tell any lies for me.  You're not eligible for

4    a 5K.

5              THE COURT:  You know, it might be --

6              MR. STONE:  Well, when did he first find out?

7              THE COURT:  This --

8              MR. STONE:  Right now during this trial?

9              THE COURT:  Well, it appears as though from the plea

10   agreement that he signed the pages that says he's eligible to

11   one, he probably did just find out.  That may present a problem

12   for Mr. Faircloth when we get to his sentencing and whether he

13   wants to proceed with his plea or not.

14             But let's do this because it's getting a little late

15   in the afternoon.  Let's go ahead and take a break right now,

16   and then we'll get back on the record in about ten minutes.

17      (Bench conference concluded.)

18             THE COURT:  Ladies and gentlemen, we're going to go

19   ahead and take an afternoon recess.  Leave your pads and

20   pencils on your chairs.  Remember don't discuss the case among

21   yourselves or with anyone else.

22             Sir, you can step down after the jury has exited.

23   Just don't discuss your testimony with anyone.  Okay?

24             THE WITNESS:  Okay.

25             THE COURT:  Thank you.

```
 1        (The jury was excused from the courtroom at 4:24 P.M.)

 2            THE COURT:  All right, counsel, our jury has exited.

 3   We're going to take about ten, and we'll get back on the

 4   record.

 5        (Recess 4:24 P.M. – 4:43 P.M.)

 6            THE COURT:  Please be seated, everyone.  We are back

 7   assembled in the courtroom.  We've got our witness on the

 8   stand, but, sir, I'm going to ask you if you could go wait out

 9   in the hallway because I think we're going to have a discussion

10   with Mr. Manford who I understand has arrived in the building.

11            THE WITNESS:  Yes, ma'am.

12            THE COURT:  Thank you.

13        (The witness exited the courtroom.)

14            THE COURT:  Mr. Stein, Ms. Oehlsen, my judicial

15   assistant, told me that you had called Mr. Manford to get him

16   to come over here, and he's here now?

17            MR. STEIN:  Yes, I --

18            THE COURT:  All right.  Before we hear from him, I

19   checked the book on 5K in the guidelines, and I didn't see any

20   reason in and of itself why this witness would not qualify for

21   a reduction.  There may be some internal thought process that

22   your office goes through in deciding whether to file the motion

23   and nothing starts until the motion is filed, but I believe to

24   tell the jury that flat out that he doesn't qualify may not

25   have been accurate.  But if Mr. Manford is here, having said
```

1    that, why don't we have him come on in, and we'll find out from

2    him what the deal is in this -- in the witness's case.

3              You can have a seat, Mr. Stein.

4              MR. STEIN:  I'm sorry?

5              THE COURT:  You can have a seat.

6              (Craig Manford entered the courtroom.)

7              THE COURT:  Good afternoon, Mr. Manford.

8              MR. MANFORD:  Hi, Judge.

9              THE COURT:  Hi.  You can have a seat wherever you're

10   comfortable.  If you're comfortable back there behind the -- do

11   you need the headset?

12             MR. MANFORD:  You know, that would be of great

13   assistance.

14             THE COURT:  Okay.  Come on up and get that.

15             I understand that Mr. Stein called you to appear --

16   whoops, he's not ready yet.  Let me know.

17             MR. MANFORD:  It's on right now.

18             THE COURT:  It's not working?  Come on up.

19             MR. MANFORD:  Where do you want me, Judge?

20             THE COURT:  Is it -- it's not working?

21             MR. MANFORD:  Sort of.  Where do you want me?

22             THE COURT:  Wherever you can hear me.

23             MR. MANFORD:  I can hear you.

24             THE COURT:  Okay.  All right.  First of all, I

25   understand Mr. Stein asked you to come over here in the middle

1   of our trial, and I appreciate your --

2               MR. MANFORD:  Oh, no problem.

3               THE COURT:  -- accommodating us.

4               MR. MANFORD:  I was just down at the Judicial Center.

5   I was walking out the door.

6               THE COURT:  Okay.  So lucky for us.  Thank you though

7   in any event.  Did he tell you why he called you?

8               MR. MANFORD:  What I can get from Mr. Stein was

9   clarification on our agreement and something to do with 5K.

10              THE COURT:  Right.  Did he tell you what he thought

11  the 5K was about in this case?

12              MR. MANFORD:  Yes.  He -- and I told him -- well, he

13  asked me if that's what I thought.  You know, our 5K is for

14  testimony in trial and grand jury.  We're not working as a

15  confidential informant or anything like that.

16              THE COURT:  Right.  Well, let me back up.

17              MR. MANFORD:  Okay.

18              THE COURT:  First of all, I would have wished that I

19  would have gotten to have asked you this question without

20  having someone else tell you what they thought it was about in

21  your client's case.  But that -- and I'm sorry that you were

22  put on the spot --

23              MR. MANFORD:  Okay.

24              THE COURT:  -- by Mr. Stein.  What do you think --

25  and let me back up and this is why we stopped -- before I ask

1    this question.   This is why we stopped your client's testimony

2    here on the stand because what you didn't hear when you were

3    not here is that Mr. Beck got into the usual cross examination

4    of a witness in a case who's testifying in the Government's

5    case in chief but was under indictment and has pled and is

6    awaiting sentencing after the trial.   Mr. Beck got into that

7    usual line of cross examination.   And he presented your client

8    with a plea agreement, paragraph 6 of which -- I believe it's

9    6; I think Mr. Beck may have it there -- talked about 5K1.

10           And that brought an objection from the Government.

11   And Mr. Stein told me while the jury was here that your client

12   wasn't eligible for 5K1.   And I wasn't certain how to take

13   that, but what I was certain of is I didn't want your client to

14   answer Mr. Stein's questions, being led into an answer under

15   oath, so I thought we'd get to the bottom of it without him

16   here and hear from you because I know that fairly recently you

17   filed a motion to continue your client's sentencing.   And it

18   said it was a joint motion.   And part of that motion relayed to

19   the Court that he was -- that we were anticipating his

20   testimony in this trial against Ms. Myers and Ms. Lindquist,

21   and that it appeared from the context of the motion that 5K was

22   on the table.

23           Now, Mr. Stein told me and counsel at sidebar that

24   perhaps that wasn't the case.   That it was just your

25   boilerplate motion.   So going into this plea -- and perhaps we

1    should approach here now and just have this discussion on the

2    record just with counsel.  I know your client is testifying so

3    -- and it's been an open trial, but in any event, let's have

4    everyone approach.

5            THE CLERK:  I don't know how the headphones are going

6    to work with the white noise.

7            THE COURT:  We don't need a white noise.

8            THE CLERK:  Okay.

9            THE COURT:  We'll just keep our voices down because

10   everybody has heard this discussion during the trial anyway.

11           THE CLERK:  Okay.

12      (Bench conference commenced outside the hearing of the

13      jury.)

14           THE COURT:  What's your understanding of the deal

15   your client has as it pertains to cooperation?

16           MR. MANFORD:  Okay.  Whether --

17           THE CLERK:  Judge --

18           THE COURT:  I'm sorry.

19           THE CLERK:  Hold on for one second.

20           THE COURT REPORTER:  Nothing comes through without

21   the white noise.

22           THE CLERK:  Nothing comes through without the white

23   noise.  Let's try it and see what happens.

24           MR. MANFORD:  I think that when I'm here, I can jack

25   up the hearing aid, and I'll be fine.

```
 1              THE CLERK:  You can do that?  Okay.

 2              THE COURT:  But I think Kate said if we don't have

 3    the white noise on, she can't hear.

 4              THE CLERK:  No, if we have the white noise on, she

 5    can hear through the headphones.

 6              THE COURT REPORTER:  The headphones only work with

 7    the white noise.

 8              THE CLERK:  Only with the white noise.

 9              THE COURT:  Can you hear him without the headphones

10    if we don't have the white noise on?

11              THE COURT REPORTER:  Not when he's facing you.  When

12    he's facing you -- not -- go ahead.  We'll try.

13              THE COURT:  Okay.  And if it doesn't work, Kate, then

14    we'll try again.

15              MR. MANFORD:  All right.

16              THE COURT:  Okay.  What's your understanding?

17              MR. MANFORD:  All right.  So my understanding is --

18              THE COURT:  No, Kate?  Not working.

19              (Open court.)

20              THE COURT:  Okay, everybody.  We're going to ask

21    everybody who is here in attendance of the trial to go ahead

22    and wait in the hall.  That doesn't mean the lawyers that are

23    here for the case or the defendants of course.  They can remain

24    at counsel table.

25                  (Courtroom cleared.)
```

```
 1              THE COURT:  Okay.  All right.  Almost there.  What's
 2   your understanding?
 3              MR. MANFORD:  Okay, Judge, you know I come from
 4   mostly a state court background.  Okay.
 5              THE COURT:  Can you hear him now, Kate?
 6              THE COURT REPORTER:  Yes.
 7              THE COURT:  Okay.
 8              MR. MANFORD:  Okay.  So my understanding was a
 9   typical situation where my client is going to give testimony in
10   this trial and grand jury, all right, and be part of the -- a
11   witness for the prosecution.  And of course in consideration
12   for that, there would be sentencing recommendations made if he
13   actually, you know, put himself out there on the line and then
14   testified.  And we -- this whole -- my client got arrested one
15   night.  Was brought in.  And I was there with him in the middle
16   of the night.  That's when this all came about.  He got caught
17   with goods.  Okay.
18              And so it was my understanding -- whatever we call 5K
19   or boilerplate -- whatever it was, is -- I mean he wasn't going
20   to be a confidential informant or anything like that.  He was
21   going to provide testimony here and assist the Government in
22   their prosecution of these people.  And depending on if he
23   actually did that that would -- the Government may make some
24   sentencing recommendations.  I mean he's got tons of relevant
25   conduct and dollar-wise in tax loss and tax revenue.  So that
```

1  was my understanding.  If that -- I'm not trying to get anybody

2  in trouble.  I'm just trying to be honest with the Court.

3            THE COURT:  No.  That's what we -- that's what I

4  asked you to tell me.  And the 5K paragraph in the plea

5  agreement?

6            MR. MANFORD:  Isn't that substantial assistance?

7            THE COURT:  Yes.

8            MR. MANFORD:  Isn't that just generally what I just

9  said we would do is just --

10            THE COURT:  Yes, without being -- yes.

11            MR. MANFORD:  Yeah.  Without --

12            THE COURT:  Yes.  Without being -- wearing a wire.

13            MR. MANFORD:  Yeah.  Exactly.  And none of that was

14  never contemplated.

15            MR. STEIN:  Your Honor --

16            THE COURT:  You see, Mr. Stein, to be eligible for

17  5K, you don't have to wear a wire and buy any dope.  You can --

18  your assistance can be whatever it is and then the Government

19  decides.

20            MR. STEIN:  No.  That is not the policy of either --

21            (Court reporter indicated to speak up.)

22            MR. STEIN:  I'm sorry.  That is not the policy of any

23  United States Attorney's Office that I know of.  There are two

24  types of cooperation.

25            THE COURT:  Didn't we have substantial assistance in

```
 1   one of these cigarette cases that didn't involve a wire?
 2             MR. STEIN:  No.
 3             THE COURT:  No?
 4             MR. STEIN:  There was always some undercover work,
 5   and they went in and they did something.  If you will remember,
 6   when I talked about Mr. -- whose sentencing was it that I
 7   compared to O'Connell as the gold standard?  These were all
 8   people who actually wore wires and went undercover.
 9             THE COURT:  Then why doesn't it say that in the
10   guidelines?  Why doesn't it say you have to wear a wire to be
11   eligible for 5K1?
12             MR. STEIN:  Well, it doesn't necessarily have to wear
13   a wire.  You have to do something other than just in-court
14   testimony or grand jury testimony.  That's your base.  And 5K,
15   in order to get it, you have to -- not only do you have to do
16   something, you have to do it to such an extent that it is
17   successful and that as a result of it, someone will either be
18   indicted or, if not, it's sufficient evidence that we could
19   actually charge somebody.  And if you don't bring that much to
20   the table, you don't get 5K.  And that's -- and both Mr. Beck
21   and Mr. Stone, as experienced practitioners in this district, I
22   will be shocked if they say they ever had a client get a 5K for
23   just in-court testimony because it doesn't happen.  It is --
24   I've been in this office since '88.  It has never happened.  In
25   the Southern District I believe it is the exact same rule.  I
```

```
 1   don't -- and when I was in Texas, it was the rule.  I know of
 2   no district at all that doesn't treat it that way.
 3              MR. BECK:  Your Honor, I --
 4              MR. STONE:  Judge --
 5              MR. BECK:  Go ahead.
 6              MR. STONE:  Go ahead.
 7              MR. BECK:  Well, I was just going to say -- I've been
 8   doing this so long I can't remember everybody I ever
 9   represented, but I can tell you that I have been to conferences
10   where I met fellow defense attorneys, and they laugh when I
11   tell them how it is here because they say in their
12   jurisdiction, they give out these 5Ks like candy.  If you show
13   up and testify at trial, you get one.  So it varies among the
14   jurisdictions.  So whether they've done it here or not, I can't
15   verify that.
16              THE COURT:  Well, do you have that plea agreement?
17              MR. BECK:  Yes, Your Honor.
18              THE COURT:  Mr. Stone.
19              MR. STONE:  Judge, I think the problem is we have
20   injected into the trial I'm yanking the rug out from under your
21   feet.  You're not eligible for a 5K.  Which apparently is
22   inconsistent with what Mr. Fairchild's lawyer understood his
23   eligibility to be.
24              THE COURT:  That's my problem.
25              MR. STONE:  That's a problem.
```

1              THE COURT:  That's a problem because we've had an

2   officer of the Court stand up in front of this jury and say

3   this witness is not eligible for a 5K, but it's in his plea

4   agreement.  The plea agreement that he signed with his attorney

5   on each and every page.  And paragraph 6 on page 3,

6   Mr. Manford, "If, in the sole opinion of the United States

7   Attorney, the defendant has provided substantial assistance in

8   the investigation or prosecution of another person who has

9   committed an offense, the Government will file a Section 5K1.1

10  motion for a sentencing guidelines reduction."

11             Is that the paragraph that you're relying on

12  regardless of whether it says 5K1 or not?

13             MR. MANFORD:  Yes, Your Honor.

14             THE COURT:  Does it mention the defendant's

15  assistance in any other part --

16             MR. STEIN:  Yes.

17             THE COURT:  -- of this plea agreement?

18             MR. STEIN:  Yes, Your Honor, it does.

19             THE COURT:  Where?

20             MR. STEIN:  I'll find it.

21             THE COURT:  Okay.

22             MR. STEIN:  Paragraph 3.

23             THE COURT:  This talks about fully cooperating;

24  correct?

25             MR. STEIN:  Yes.  Which is different than substantial

 1  cooperation.

 2          THE COURT:  All right.  But it doesn't say the

 3  Government is going to do anything in return for it in this

 4  paragraph 3; correct?  The only place where --

 5          MR. STEIN:  Which is what this witness was saying.

 6          THE COURT:  It's not what Mr. Manford was saying.

 7  What Mr. Manford -- the words that came out of his mouth was

 8  substantial assistance.  And paragraph 6 is the only place that

 9  that's mentioned.

10          And I'm sorry you're on the hot seat, Mr. Manford,

11  because you're kind of in between lawyers.  And I know this is

12  a very cordial bar and this ordinarily doesn't happen.  But I

13  have a concern that I've got a jury that may have been misled,

14  lawyers that relied upon language in a plea agreement, and they

15  used it on cross examination so now Mr. Beck is going to look

16  like he's somehow been dishonest when he was relying on this.

17  And, more importantly, we've got your client, Mr. Manford, on

18  the stand about ready to answer a question from Mr. Stein

19  leading him into the fact of, well, you weren't -- you had no

20  expectation of the Government filing a 5K1 motion if you

21  cooperated by testifying truthfully in our case in chief.

22          MR. STEIN:  May I address that, Your Honor?  The

23  witness said that.  He said it on the stand.  I don't believe

24  the U.S. Attorney's Office has anything to do with it.  My

25  understanding of it is it's just going to go to the judge who

1   has heard me testify.  That's exactly what this plea

2   agreement -- the defendant has got it right.

3           THE COURT:  That's the bottom line.  That's what I

4   heard him say.  What he was saying was ultimately it's the

5   judge's decision and that's true.  But that's not -- that's not

6   where Mr. Beck was going with this.  And he was led to believe

7   there was an expectation on behalf of the defendant, if he did

8   everything -- or this witness as a defendant in his own case,

9   if he did everything that was expected of him, the Government

10  will file a 5K1 motion.  He led him through that testimony.

11  And then you stand up and object and say, Your Honor, he

12  doesn't qualify for 5K.  Well, in and of itself, that's not

13  true.

14          MR. STEIN:  It is true because first of all, the

15  witness has said he wasn't.  But that -- it says within the

16  sole discretion of the United States Attorney's Office --

17          THE COURT:  Right.

18          MR. STEIN:  -- and I am saying that that sole

19  discretion is never going to be exercised for a 5K in a purely

20  testimonial witness.

21          THE COURT:  Then why was it in the plea agreement

22  which was signed November 2017?

23          MR. STEIN:  Because --

24          THE COURT:  Why?

25          MR. STEIN:  It is boilerplate.  It either goes in or

1    goes out.  And it's up -- and when we talked about it -- some

2    defense lawyers want it in.  Some defense lawyers want it out.

3    And --

4           THE COURT:  Did you ask for that to be in there,

5    Mr. Manford?

6           MR. MANFORD:  Well, I sure was glad to see it.  I'm

7    just trying to be honest.  Yeah, I --

8           THE COURT:  No, I understand.  Were the nuances of

9    this discussed with you?  It's in there, but it's meaningless.

10    Have your client sign it.

11           MR. STEIN:  The reason why I --

12           THE COURT:  No.  I'm asking Mr. Manford.  Were the

13    nuances of this --

14           MR. MANFORD:  The truth is no.  I thought 5K was

15    substantial assistance.  I'm not trying to get anybody in

16    trouble.

17           THE COURT:  Right.

18           MR. MANFORD:  I'm still trying to protect my client.

19    But I did not -- you know, I thought this -- my understanding

20    was this would be substantial assistance.  I'm sorry.  That's

21    it.

22           THE COURT:  Okay.

23           MR. MANFORD:  That's it.

24           THE COURT:  And that's what you told your client?

25           MR. MANFORD:  Yes.

```
 1              MR. STEIN:  Your Honor, the reason why I called
 2   Mr. Manford, and he is going to -- I believe he will say I'm
 3   correct in what I'm about to say -- is that when he filed --
 4   this motion was suggested that it was a joint motion that I
 5   actually participated in.  But when the motion was filed, I
 6   looked at it afterwards, and I called him and said, no, this
 7   isn't a 5K.  You'll get our recommendation but not under 5K.
 8   And so I -- and so to the extent that we're saying, oh, you
 9   signed this joint motion, I didn't.  It was -- I had agreed --
10   when Craig wanted to get a continuance to allow his client to
11   testify, I said, well, I'll join in that to give him an
12   opportunity to testify.  And then when he filed it saying 5K, I
13   called him and said this isn't a 5K case.  This is a regular
14   cooperation case.  And he said okay.  And we were going to take
15   it from there.
16              THE COURT:  Do you recall that conversation,
17   Mr. Manford?  I'm sorry you're on the spot, but do you recall
18   it?
19              MR. MANFORD:  All right.  Look, folks, I don't recall
20   it.  He could have.  You know my practice.  I'm in court --
21              THE COURT:  Yes.
22              MR. MANFORD:  -- four or five hearings a day.  He
23   could have done it.  I don't have a recollection of that.  But
24   he's never lied to me -- you know, I don't know.  It's
25   possible.  But I would think -- I'm sorry.  I would think I
```

```
 1   would remember it if we had that conversation.  But I'm not --
 2   it's possible.
 3           THE COURT:  Let me ask you this.  If you had had that
 4   conversation with Mr. Stein before your client testified, would
 5   you have discussed that with your client then after he signed
 6   this plea agreement?
 7           MR. MANFORD:  Well, you would hope I would, yeah.
 8           THE COURT:  Right.  And I imagine you would have.
 9   All right.  And I am sorry you're on the spot.
10           MR. MANFORD:  Is what it is, Judge.
11           THE COURT:  Yeah.  Is there any reason that we need
12   Mr. Manford to stick around --
13           MR. STEIN:  No.
14           THE COURT:  -- any further, gentlemen?
15           MR. BECK:  No, Your Honor.
16           MR. STEIN:  No.
17           THE COURT:  Okay.  We can have argument without you.
18   Thank you for making yourself available and, again, I am sorry
19   we had to put you on the spot.
20           MR. MANFORD:  I'm sorry to everybody.  I don't know
21   -- I -- anyway.
22           THE COURT:  No, yours is -- there is no apology for
23   you to make, Mr. Manford.
24           MR. MANFORD:  All right.  Thanks, Judge.
25           THE COURT:  Thank you.
```

 1            (Mr. Manford was excused.)

 2            (Bench conference concluded.)

 3       THE COURT:  Mr. Beck, this is yours before I stuff it

 4  somewhere.  This plea agreement.

 5       MR. STEIN:  Your Honor, may I address the point that

 6  Mr. Stone made about the potential prejudice?

 7       THE COURT:  There's a lot of potential prejudice.

 8  But let's -- Mr. Stone, make the point again.

 9       THE CLERK:  Do you want the parties back in?

10       THE COURT:  Oh, yeah.  We can bring everyone back in

11  to this.

12       MR. STEIN:  His point was that because I told the

13  witness that he was not eligible that somehow hurt his client's

14  case.

15       THE COURT:  No.  You stood up to begin with and told

16  me, in lodging your objection against somewhere Mr. Beck was

17  going with his cross examination with this plea agreement, this

18  witness is not eligible.

19       MR. STEIN:  Yes.  Yes.  I'm agreeing with that, Your

20  Honor.  I --

21       THE COURT:  Okay.

22       MR. STEIN:  I'm saying Mr. Stone is saying that my

23  statement prejudices his client.  And I was going to address

24  that statement.

25       THE COURT:  Mr. Stone, can you put it upon the

 1   record.

 2           MR. STONE:  Well, Judge, I think what we were saying

 3   is that I believe I referenced 5K on my cross of Mr. Fairchild.

 4   I believe I referenced that to some extent.  I didn't go into

 5   it in detail.  But, you know, obviously the inference to be

 6   made is -- and I think he acknowledged it to some extent.  He's

 7   here because he's got to be here, and he's hoping to get some

 8   kind of benefit out of it.  And with Mr. Beck's cross

 9   examination, properly questioning him about what we had in

10   writing -- because we had not been informed that there had been

11   any subsequent discussions that, you know, Fairchild -- the 5K

12   is off the table for him.  I mean given the fact that he met

13   with them, he testified before a grand jury, and he's here

14   before a trial, typically I would envision that would be

15   someone eligible for a 5K or a very favorable sentencing

16   recommendation.

17           THE COURT:  Sounds like he and his attorney thought

18   so from what Mr. Manford told us.

19           MR. STONE:  And anymore -- I mean in the old days I

20   guess when the guidelines were mandatory, you had to have a 5K.

21   But nowadays the guidelines are advisory.  So if you get a

22   favorable recommendation from the Government, it's almost

23   analogous to a 5K.  I mean if the Government makes a favorable

24   recommendation --

25           THE COURT:  We need Mr. Fairchild to remain outside.

```
 1   If you could, Mr. Fairchild, we'll get you, sir.  Is he out --
 2   is he still out there?
 3           (Simultaneous speech.)
 4           THE COURT:  Okay. I should wear my glasses.  Thank
 5   you.
 6           MR. STONE:  The problem is -- and, again, I mean
 7   maybe we should have had a bench conference for the objection
 8   rather than --
 9           THE COURT:  There --
10           MR. STONE:  -- discussing it --
11           THE COURT:  There should have been a bench conference
12   when the first mention of 5K was out of either one of your
13   mouths, Mr. Stone or Mr. Beck, before you went down that road
14   relying upon what was in that plea agreement in black and
15   white, signed by the witness and his attorney.
16           MR. STONE:  But the -- I mean the problem is now
17   we've -- we have injected, you know, well, you're never getting
18   a 5K.  You're not eligible.  And --
19           THE COURT:  We didn't inject.  We didn't know.
20           MR. STONE:  So now --
21           THE COURT:  We interjected the Government saying he's
22   not eligible, this wasn't the agreement, is what we've
23   interjected because Mr. Manford didn't say that.
24           MR. STONE:  Right.  So -- I mean I don't -- I mean I
25   think it's problematic, Judge.  I mean because, again -- I mean
```

1    I'd be shocked if Mr. Fairchild truly doesn't believe that he's

2    not eligible for a 5K.  That might be the first time he heard

3    about it today.

4            THE COURT:  And let's put another layer on this.

5    He's yet to be sentenced.

6            MR. STEIN:  Right.

7            THE COURT:  And he's under oath.

8            MR. STEIN:  Right.

9            THE COURT:  And I'm the judge that's going to

10   sentence him.

11           MR. STEIN:  Right.

12           THE COURT:  So it's going to be very hard for me to

13   believe if he sits here and he says, oh, no -- when you ask him

14   a leading question -- I had no idea that the Government wasn't

15   going to file a 5K1 motion if I did my part, and I gave you all

16   this truthful testimony because it's in his plea agreement that

17   he signed.  That's the only place it talks about the Government

18   asking for him to be cut a break for cooperation.  So it puts

19   him in a really bad spot.  Talk about prejudice.

20           MR. STEIN:  The question -- I think we're missing --

21   I've been trying to address Mr. Stone's -- what I thought he

22   was saying was that his client is prejudiced by it.  And I --

23           THE COURT:  That's what he's saying.  But I'm saying

24   there's another layer here --

25           MR. STEIN:  I understand.  But I'd --

1          (Simultaneous speech.)

2          MR. STEIN:  -- like to do it one at a time.

3          THE COURT:  Okay.

4          MR. STEIN:  So I would first like to address that his

5  client is being prejudiced.  And I would say that there cannot

6  possibly be prejudice because this witness has now heard that

7  in the Government's version he -- well, he would get in our

8  version -- this hasn't been explained to him, but it's his

9  understanding anyway that he's not going to get 5K.  That very

10  limited thing.

11          Now, the defendant -- now that he knows that -- and

12  if the defense asks him if he wants to change his mind about

13  anything and testify, he's still under oath.  He is fine.  He

14  can testify that, oh, now that I'm not getting -- I'm not doing

15  anything for the Government, well, yeah, the defendants are all

16  not guilty if he wants to.  Because I just told him that it --

17  but that's not true.

18          THE COURT:  The toothpaste is out of the tube at this

19  point with --

20          MR. STEIN:  Not for him.

21          THE COURT:  -- his testimony.  It's not going back

22  in.  He can't change his testimony now.  He's under oath.

23          MR. STEIN:  Well, why can't he change his testimony?

24          THE COURT:  Because then he would be a liar in your

25  estimation, and then you could prosecute him for perjury.  So

1    he's -- there's no way he's changing his testimony now.  The

2    toothpaste is out of the tube.

3           MR. STEIN:  No.

4           THE COURT:  He's smart enough.  He told us he's been

5    a criminal his whole life.  He's not going to even attempt to

6    put it back in and change direction.

7           MR. STEIN:  Well, I would just stand then on the fact

8    that his testimony is accurate.  His testimony is exactly what

9    we told him in debriefings.  That this is all going to come

10   down to the judge.  If he testifies and we believe he's

11   testifying truthfully, we will tell the judge that we think he

12   testified truthfully and ask the Court to give it the

13   consideration that the Court deems appropriate.  And that's

14   what he essentially said.  And that is his understanding of the

15   agreement, and it actually is the agreement even though it has

16   another clause that's not applicable to him.  He was exactly

17   right which is why I was getting upset.  And maybe I shouldn't

18   have gotten upset, but I was getting upset because in my view,

19   both Mr. Beck and Mr. Stone know that there's not going to be a

20   5K in this, and they're thinking he's lying.  And --

21          THE COURT:  Well, let's ask them.  Mr. Beck, did you

22   stand up here and cross examine this witness knowing that he is

23   not going to get a 5K?

24          MR. BECK:  I did not, Your Honor.  And, you know -- I

25   did not, Your Honor.

1          MR. STEIN:  But --

2          THE COURT:  How about you, Mr. Stone?

3          MR. STEIN:  I'm sorry.

4          MR. STONE:  No, Your Honor.  And, again, my

5    understanding of eligibility for a 5K is similar to what

6    Mr. Manford said.  I mean the days of you got to go make a buy,

7    I mean I don't -- I kind of disagree with that.  I don't think

8    that that's an absolute mandate anymore and, again, the

9    guidelines aren't mandatory.  It's a whole different thing now

10   with regard to sentencing.  I mean the Government can make a

11   sentencing recommendation or say we don't oppose the

12   defendant's request, and it's almost like a 5K without formally

13   filing it.  I mean, I -- I mean his lawyer said that's how he

14   understood it.  And to say that Mr. Fairchild understands it

15   differently than his lawyer, I mean I don't know --

16         THE COURT:  And Mr. -- here's my problem, too,

17   Mr. Stein.  Mr. Manford is on the A-list of criminal defense

18   attorneys here in federal court and in state court.  If he --

19   what he understood the plea agreement to be is exactly what I

20   would expect he would have relayed to his client.  So

21   Mr. Manford and Mr. Fairchild clearly have a meeting of the

22   minds on what they thought -- between the two of them what they

23   thought the plea agreement --

24         MR. STEIN:  Your Honor --

25         THE COURT:  -- was going to be because Mr. Manford

1  would have advised him whether he should take the plea or not

2  and discussed that plea agreement with him.  Mr. Manford, if he

3  thought that substantial assistance and the benefit to be

4  obtained from the Government as it was written in that

5  paragraph 6 of the plea agreement that they both read and

6  signed meant one thing, then that's what he told his client.

7  And that's what I would have expected then the client would

8  believe what --

9          MR. STEIN:  Regardless --

10          THE COURT:  -- his lawyer told him.

11          MR. STEIN:  -- of what he told his client, his client

12  wouldn't have testified the way he did because his client

13  didn't testify that I believe that there was a 5K.  His client

14  testified that he thought that his obligation was to tell the

15  truth and that the United States Attorney's Office was going to

16  tell the judge something, but it was ultimately up to the

17  judge.  That was what he said his understanding is.

18          THE COURT:  And he also mentioned something, did he

19  not -- and I did not write it down so it's not in my notes.

20  But I thought he said something about he referred to a

21  calculation.

22          MR. STEIN:  Yeah, he was talking about the

23  guidelines.

24          THE COURT:  Uh-huh.

25          MR. STEIN:  That's what I thought.

```
 1              THE COURT:  And he said he was going to basically --
 2   and I'm summarizing -- receive some benefit on a recommendation
 3   from the Government that there would be a reduction in that
 4   calculation.
 5              MR. STEIN:  Exactly.
 6              THE COURT:  That's a 5K.
 7              MR. STEIN:  No, that's a normal --
 8              THE COURT:  That's not a, Your Honor, we're
 9   requesting that you variant sentence --
10              MR. STEIN:  No.
11              THE COURT:  -- this defendant under the --
12              MR. STEIN:  I'm not asking --
13              THE COURT:  -- guidelines.
14              MR. STEIN:  -- for variance.  Your Honor, that is the
15   normal in-court recommendation.  It's not 5K.  It's paragraph
16   3.
17              THE COURT:  I -- the normal recommendation absent a
18   5K from the Government is, Your Honor, we recommend that you
19   sentence the defendant at the low end of the guidelines.
20              MR. STEIN:  On 5K?
21              THE COURT:  That's not -- no, not on a 5K.
22              MR. STEIN:  Right.
23              THE COURT:  What you just said to me was he was
24   talking about the normal calculations of the -- the normal
25   recommendation I think is what you just said to me.  And, no,
```

 1  the normal recommendation of the Government -- because I

 2  sentence all the time -- is absent a 5K, the Government stands

 3  up, if they have an agreement with the defendant, and they say,

 4  Your Honor, in accordance with our agreement, we ask that you

 5  sentence this defendant at the low end of the guidelines.

 6          That doesn't -- that's not at the point where we're

 7  calculating.  This witness out of his own mouth had an

 8  understanding there was going to be some recommendation by the

 9  Government for a reduction in the calculation of his

10  guidelines.  That's a 5K.

11          MR. STEIN:  Your Honor, in other contraband cigarette

12  cases -- I'll ask someone with a better memory than I am to

13  tell you exactly which it was -- we had a defendant in a

14  similar situation as Mr. Fairchild.  The Government made a

15  recommendation of the low end.  And during that recommendation,

16  the Government went on to say how -- just how cooperative the

17  defendant was, and this Court varied below the low end.

18          THE COURT:  For a reduced -- for a sentence below --

19          MR. STEIN:  The guideline.

20          THE COURT:  -- the guidelines.

21          (Simultaneous speech.)

22          MR. STEIN:  But it wasn't a motion under 5K.  It was

23  just a --

24          THE COURT:  No, it wasn't.  But I don't think it was

25  made at the time I calculated the guidelines either --

```
 1                MR. STEIN:  Yes, it -- you had already calculated the
 2    guidelines.
 3                THE COURT:  Right.
 4                MR. STEIN:  And you gave him a sentence of less than
 5    that when I went on and on about how cooperative the witness
 6    was.  And it was a paragraph 3 recommendation just like
 7    Mr. Fairchild would get in this case.
 8                THE COURT:  But I don't think that's Mr. Fairchild's
 9    understanding --
10                MR. STEIN:  But it's exactly his understanding.
11    That's what he said.  We should have the court reporter read
12    back what he said.
13                THE COURT:  She's not going to do that.
14                MR. STEIN:  Okay.  But --
15                THE COURT:  And -- but that wasn't what Mr. Manford
16    said so I don't see how he -- Mr. Manford could have thought
17    one thing and his client thinks another.
18                MR. STEIN:  Well, for one thing, Mr. Manford has
19    elected not to attend all the debriefings.  And in every
20    debriefing, we routinely tell the witness that it's his
21    obligation to tell the truth and that at the end of the day, he
22    must tell the truth.  If he lies, essentially he's dead meat.
23    But if he tells the truth, we'll tell the Court about it.  But
24    at the end of the day, it's up to the Court.  And we tell every
25    witness that whether the lawyer is there or not.  And we're
```

1    really adamant with our witnesses you've got to tell the truth,

2    and it's up to the judge.  And then the judge is the one who is

3    going to view your credibility.  So it really doesn't matter

4    what I say.  If the judge doesn't believe that you're telling

5    the truth, you're not going to get it.  If the judge believes

6    you're telling the truth, pretty much no matter what I say,

7    you're going to get it.  It's up to the judge who will make

8    these determinations.  And we tell this to every witness.

9             THE COURT:  Regardless of whether they are

10   anticipating a 5K1 motion or not?

11            MR. STEIN:  Well, no, it is different with --

12            THE COURT:  Because if you testify, you got to --

13            MR. STEIN:  People who are really expecting a 5K like

14   -- well, I don't want to say it in open court, but there are a

15   few of them out there.  They have a different thing.  They,

16   again, a, they know that in addition to the cooperation, they

17   must do something.  In the most recent one that you know about

18   is setting up wearing a wire and doing it and that he's not

19   going to get a 5K unless it's successful.  He knows that.  His

20   attorneys know that.  And if that fails, it has nothing to do

21   with what his cooperation was testimonially.  But he's actually

22   on a double track.  He wants to give testimony as well.  But

23   they're separate.  The 5K is going to work for the Government.

24   And maybe they're right that some districts give them away like

25   candy, but neither this district nor the Southern District does

1   that.  It's an absolute requirement that not only do they have

2   to do something more than just testify in court, they have got

3   to be successful.

4              THE COURT:  Okay.  Thank you, Mr. Stein.  Mr. Stone.

5              MR. STONE:  Judge, I guess I've said everything I can

6   say.  I just don't know how we kind of unring that bell.  You

7   know that's problematic I think.

8              THE COURT:  Mr. Beck.

9              MR. BECK:  Your Honor, the only thing I would say

10  is -- and I don't need to tell you or anyone else who knows

11  Mr. Manford -- he's probably a better lawyer than I am and one

12  of the best lawyers here in town.  And if he had that

13  understanding, then I don't think it's fair for Mr. Stein to

14  say there's some blanket rule that he -- that in this district

15  that he had to make a controlled buy or something.  So I'm like

16  Mr. Stone.  I don't see how we can unring this bell, Your

17  Honor.  I see a couple options here.  If the Court wants to

18  hear what I think, I'll --

19             THE COURT:  Go ahead.

20             MR. BECK:  I don't do this lightly.  I am moving the

21  Court to dismiss the case for Government misconduct.  This jury

22  has been poisoned, and there's no other remedy that will be

23  fair to my client.  The last thing we want to do is try this

24  case again.  So a mistrial would be prejudicial to her.  She's

25  already been through a nightmare long enough.  I am moving for

1   a mistrial, Your Honor -- or not a mistrial but dismissal on

2   the grounds of Government misconduct.

3           THE COURT:  Mr. Stone.

4           MR. STONE:  Judge, I mean I think I have to agree

5   with Mr. Beck.  I mean we're -- you know, I think Mr. Stein

6   made a mistake.  And it should have been handled at bench

7   conference.  But this is out there now.  And they were

8   listening pretty intently to all that.  And, you know, I

9   mean we're well into this trial.  This is our fourth day into

10  this trial.  But, you know, we didn't bring this about

11  ourselves.

12          THE COURT:  Can we cure it?

13          MR. BECK:  I don't see how, Your Honor, because it's

14  going to have to be involved somebody telling the jury that

15  Mr. Stein misrepresented the truth to them.  And I don't know

16  how that's going to -- I don't know how that would work first

17  of all.  So I don't see how it can be fixed, Your Honor.  You

18  know, the only options I see are dismissal for Government

19  misconduct or mistrial, and I would beg the Court not to grant

20  a mistrial because -- at least I don't think we want a mistrial

21  because this thing is just -- we don't want to -- yeah.  So

22  those are my positions, Your Honor.

23          THE COURT:  I guess the problem is -- because my

24  initial thought was to instruct the jury that they had to

25  disregard the statement that he wasn't eligible for the 5K.

1          MR. STEIN:  May I address the curing of it, Your

2    Honor?

3          THE COURT:  Yes, sir.

4          MR. STEIN:  And I would also like to address my

5    conduct.  On the merits, I would say that the Court -- and the

6    Government won't object to this -- and say that there was a

7    good-faith misunderstanding among counsel; and that as a pure

8    matter of law, the witness is entitled to a 5K reduction.

9          THE COURT:  I can't say there was a misunderstanding.

10         MR. STEIN:  Well, there is.  They think it's one way.

11   I think it's another.  We still have this real disagreement

12   about in good -- I believe that Mr. Beck is in good faith.  I

13   believe that Mr. Stone is in good faith.  If they want to stand

14   up and say that they really believe I am in bad faith about

15   what I believe is going on, let them say it.  But I don't think

16   they're going to say I'm in bad faith.  I think that we just

17   saw it completely differently and have our honest difference

18   about what this is.

19         And if you will let me say one thing about the

20   merits -- I mean my conduct, I would appreciate the

21   opportunity.

22         THE COURT:  Absolutely.

23         MR. STEIN:  In my way of thinking and from my

24   perspective -- I've grown up and why I'm a lawyer is that one

25   of the things that I think is very important in the criminal

1    justice system is that witnesses who are telling the truth

2    shouldn't be beaten up and badgered for telling the truth.  And

3    I believe that Mr. Fairchild was telling the truth when he said

4    his understanding was that -- exactly how he said that it

5    wasn't up to the United States Attorney's Office and that he

6    was just going to testify, and it was going to be up to the

7    judge at the end of the day.  And so that's why I said what I

8    said.  But -- and it was just because I thought, from my point

9    of view -- and I understand that you probably think I'm

10   wrong -- but I thought that the witness was being treated

11   unfairly by defense counsel.

12           THE COURT:  Thank you, Mr. Stein.  Anything further,

13   Mr. Stone?

14           MR. STONE:  Well, Judge, maybe the -- if the Court is

15   not going to grant that motion and try to do a curative

16   instruction, maybe the best way to do it would just be simply

17   say that if the Court instructs the jury that Mr. Fairchild is

18   eligible for a 5K, and we don't have to get into all the other

19   stuff.  And then the jury won't probably wonder what the heck

20   is going on.  You know, maybe do it that way if the Court is

21   not going to grant Mr. Beck's motion that we joined in.

22           THE COURT:  This is the first time I've had to

23   consider an issue like this ever and especially just deciding

24   from the hip.

25           Mr. Beck, anything further?

1          MR. BECK:  Your Honor, regarding the curative

2   instruction -- and this is why I think it gets problematic is

3   because the plea agreement says it's in the opinion of the

4   United States Attorney.  What Mr. Stein has told the jury is

5   the United States Attorney has decided this man will never get

6   a 5K.  The United States Attorney is in Charleston,

7   West Virginia, and we have been provided with nothing on the

8   record that says a decision like that has been made.  So for

9   this Court to correct it, I believe you'd have to tell the jury

10  that Mr. Stein made a statement that the U.S. Attorney has not

11  decided.  So I just don't know how to fix it, Your Honor, and

12  that's my concern.  And I don't -- I didn't anticipate this

13  would happen.  Certainly didn't set it up this way.  But we're

14  in this position, and I just think there's only one fair thing

15  to do for Ms. Lindquist.

16          THE COURT:  All right, counsel.  This is what we're

17  going to do.  We're going to end this trial today.  And I'm

18  going to consider the arguments made by counsel, review the

19  testimony that we had from this witness along with what

20  Mr. Manford told us when he came in here today.  And I'll

21  reserve ruling on Mr. Beck's motion until we meet again

22  tomorrow morning at 8 o'clock.  Unfortunately, we'll have to

23  have our jury come back tomorrow, and it may or may not be for

24  naught.

25          There is some good news if we continue on with the

1  case because Mr. Mullen has been advised that the witness who

2  couldn't -- I'm sorry, the juror who couldn't be with us any

3  longer than tomorrow has checked with his boss, and he's not

4  going out of town now because he wants to finish his service.

5  And the female juror, who had an operation scheduled for

6  Wednesday, has moved her operation.  So we'll still have a full

7  12 as well as an alternate.  If there's any bright light on

8  anything that we've discussed today, there you have it.

9            I just want to make sure that I give this thoughtful

10  consideration and really think about everything that I've heard

11  here this afternoon, counsel.

12            So we will go ahead and ask Mr. Mullen to release our

13  jury unless you want them brought back in here again, counsel.

14            MR. BECK:  No, Your Honor.

15            MR. STONE:  That's okay, Your Honor.

16            THE COURT:  All right.  We'll ask them to return

17  tomorrow morning at 8:00 and tell them that if we promise them

18  they'd be finished by noon -- because I know the one has to get

19  some interim grades in so we'll finish by noon tomorrow, and

20  then we'll pick up on Tuesday with what we have left.

21            Anything further on behalf of the Government?

22            MR. STEIN:  No, Your Honor.

23            THE COURT:  Anything further, Mr. Stone, on behalf of

24  your client?

25            MR. STONE:  No, Your Honor.

```
 1              THE COURT:  Anything further, Mr. Beck?

 2              MR. BECK:  No, Your Honor.

 3              THE COURT:  All right.  Defendant is remanded to the

 4    custody of the United States Marshal.

 5

 6       (Court was adjourned at 4:30 P.M., continuing the trial to

 7       November 9, 2018.)

 8                              -  -  -

 9       (The following proceedings were held November 9, 2018, at

10       8:40 A.M.)

11                              -  -  -

12              THE COURT:  Please be seated, everyone.  We'll call

13    our case.

14              THE CLERK:  This is the case of the United States of

15    America versus Reba Marcelle Myers and Lisa Renee Lindquist.

16    Criminal number 3:17-cr-70, defendants 1 and 2.

17              The Government is represented by counsel, Michael

18    Stein and Christopher Jackson.  The defendants are present in

19    person and by counsel.  Robert Stone for Ms. Myers.  Barry Beck

20    and Nicholas Matzureff for Ms. Lindquist.

21              Are the parties ready to proceed?

22              MR. STEIN:  The United States is ready.

23              MR. STONE:  Mrs. Myers is ready.

24              MR. BECK:  Ms. Lindquist is ready, Your Honor.

25              THE COURT:  All right, counsel.  Our jury is here.
```

1    They're in the back while we address a motion raised by or made

2    by Mr. Beck at the close of business yesterday.  Mr. Beck had

3    made a motion for this case to be dismissed on the basis of

4    prosecutorial misconduct.  I preferred, instead of ruling from

5    the hip, to consider the conversation that we had with

6    Mr. Manford, who represents the witness who had been on the

7    stand in this case, to review the arguments that counsel had

8    made with regard to this issue surrounding Mr. Fairchild and

9    his plea and any agreements contained within his plea, and also

10   of equal importance, to review the law that I believed

11   pertained to the concern and the issue raised yesterday here in

12   the middle of this jury trial.

13          So we're here to consider the motion this morning

14   first.  Depending upon the Court's ruling on the motion, if the

15   motion is denied, then we'll proceed to the remainder of the

16   Government's evidence in this case.

17          Mr. Beck, given an evening to think about what

18   transpired and do your own research, would you like to be heard

19   further on your motion?

20          MR. BECK:  I would, Your Honor, because I think I've

21   got a more coherent statement to make to the Court now that I

22   have had a chance to think about all of this.

23          THE COURT:  I imagine it may have come as a surprise

24   to you during your cross examination of Mr. Fairchild to learn

25   that the 5K substantial assistance portion of the plea

1   agreement that you had received along with Mr. Stone was not

2   really on the table.

3   　　　　MR. BECK:  It was, Your Honor, and I do want to make

4   a proffer as an officer of the Court with some additional facts

5   that I have obtained since yesterday.  This morning I got in my

6   office early and on a lark called the Southern District of West

7   Virginia Federal Public Defender's Office to try to get someone

8   on the line who might be able to enlighten me as to the actual

9   practice in that district with regard to 5K1 motions.

10   　　　　I was lucky.  The gentleman came in at 7:30.  His

11   name is George Lancaster.  I believe he is the senior federal

12   public defender.  Not the public defender but the senior

13   assistant federal public defender.  I did not have a lot of

14   time to explain to him why I was asking this question.  I

15   simply put to him, "Are you aware of any rule in the Southern

16   District of West Virginia where a cooperating defendant will

17   never get a 5K1 motion unless they make controlled buys?"

18   　　　　His answer -- and I'm going to -- this is my proffer,

19   Your Honor -- was no.  It could happen one of three ways.  One

20   is a defendant could make controlled buys.  Two is they can

21   testify in a grand jury and before a trial.  And three is they

22   can refer the Government to someone who can make controlled

23   buys.

24   　　　　He further added that in his experience -- and I

25   gather from his picture on the website he's probably about my

1  age, in his late 50s, early 60s.  He said more often than not

2  my clients fall into category two, that is, the grand

3  jury/trial testimony route because most of my clients are in

4  custody and cannot make controlled buys.

5         So I wanted to let the Court know that as an officer

6  of the Court that I'm proffering that's the information I

7  obtained.  I can't vouch for Mr. Lancaster, but I have no

8  reason to believe that he's not an experienced attorney given

9  his position with that office.

10         So given that, Your Honor, I think you're presented

11  with a scenario where the Government had what I would call one

12  of their principal, if not principal, witnesses against my

13  client testify.  He provided testimony which at least in some

14  ways implicated my client in the alleged conspiracy.

15         During my cross examination, I asked him about his

16  incentives for testifying.  One of those questions concerned

17  the 5K1 aspect of his plea agreement.  I have no -- I mean

18  perfectly proper cross examination.  I've done it for years in

19  every criminal case I've been involved in where that was an

20  issue.

21         During that, the Government objected.  And I don't

22  recall the precise words that the Government used, but it was

23  certainly a statement to the jury that this individual could

24  never get a 5K1 motion under any circumstances because he had

25  not made controlled buys.  He was not eligible I believe is the

1    statement that was made.  That statement, as I understand it,

2    is both legally wrong and factually wrong given the information

3    that I have learned today from Mr. Lancaster.

4              The prejudice that -- so it was improper, Your Honor.

5    The prejudice now is that the jury, as it stands, believes that

6    this individual had no reason to provide testimony that was

7    favorable to the Government because his plea agreement would

8    not get him any further benefit.  But also more importantly,

9    the jury is left with the impression that I have attempted to

10   play games with them by suggesting that he did when, in fact,

11   according to Mr. Stein, that's not possible.

12             I don't know how to fix this, Your Honor.  It seems

13   to me it's gone off the rails, and it's because of the

14   Government; and I think a dismissal is appropriate.  Thank you,

15   Your Honor.

16             THE COURT:  Mr. Stone.

17             MR. STONE:  Your Honor, I don't think I have anything

18   else to add.  I think Mr. Beck accurately summarizes what

19   occurred.

20             THE COURT:  One moment, gentlemen.

21             I'm sure you heard the printer running up here,

22   gentlemen.  Ms. Fletcher, my law clerk here seated to my left,

23   told me that there was some things that were just filed this

24   morning by the Government, meaning some paperwork here filed by

25   the Government this morning.  And I'm going to take a moment to

1  look at it.  Have you all seen it?

2         MR. STONE:  Yes, Your Honor.  We looked at it when we

3  came in this morning.

4         MR. BECK:  Yes, Your Honor.

5         THE COURT:  Okay.

6         MR. JACKSON:  Your Honor, I can summarize what was

7  filed.  But if Your Honor --

8         THE COURT:  Don't you want me to read it?

9         MR. JACKSON:  Yes.  Absolutely, Your Honor.

10        THE COURT:  Okay.  Mr. Jackson, do you really want to

11 interject yourself into this discussion considering the nature

12 of it since it sounds like a plea that may or may not have been

13 offered to Mr. Fairchild by Mr. Stein and hook yourself to that

14 engine?  And I'm just saying that because I try to look out for

15 everybody.

16        MR. JACKSON:  I appreciate that very much, Your

17 Honor.  My office has a vested interest in this case along with

18 the United States Attorney's Office.  And as I am the only one

19 familiar with the facts, who is nevertheless independent of

20 that office, I was the only one in the position to make the

21 motion that Your Honor is now reviewing.

22        THE COURT:  All right.  Let me take a look at it

23 then, gentlemen, if there's no objection by Mr. Stone or

24 Mr. Beck.

25        All right, gentlemen.  Let's set aside Mr. Beck's

1    motion to dismiss for the time being, and we'll address the

2    Government's motion for a hearing.  Mr. Jackson.

3            MR. JACKSON:  Yes, thank you, Your Honor.  Obviously,

4    under the local rules, I am not supposed to file independent of

5    an attorney in the United States Attorney's Office for either

6    the Northern or Southern District of West Virginia.  And I

7    filed this motion under the local rules that gives the Court

8    the authority to make exceptions in the interest of justice.

9            THE COURT:  I would say this is an exception.

10           MR. JACKSON:  Thank you, Your Honor.

11           THE COURT:  So I'll hear you out on your motion.

12           MR. JACKSON:  Thank you.  The Government believes

13   that the remedy that the defendants have requested is a drastic

14   remedy that is not called for under the prevailing authorities

15   in the Fourth Circuit which made clear that the very draconian

16   remedy of dismissal of the indictment should only be considered

17   if there has been prejudice to the defendants that can't be

18   cured by other means.  And that of course is to vindicate the

19   public's interest in determining the guilt or innocence of

20   those who have been accused of crime.

21           I think if Your Honor -- the reason why the

22   Government has requested a hearing is to put the facts before

23   this Court under oath by those individuals who are present with

24   Mr. Fairchild and his attorney when he entered into a plea

25   agreement.

1            THE COURT:  Well, the problem is, Mr. Jackson, that

2   nothing any witness you would call to the stand at that hearing

3   would change the fact, would it, that Mr. Stone and Mr. Beck

4   were provided with a plea agreement that include the 5K term in

5   it, and at no time until this witness was on the stand being

6   cross examined did they hear that it was not on the table.

7   They prepared their cross for this important material witness

8   based upon that portion, in part, of the agreement and that

9   cooperation as contained in the agreement, which was never

10  corrected, was the very part or most of the part of their cross

11  examination that they used to prove that he was not to be

12  believed by the jury.  That would completely -- if the jury

13  decided to disbelieve this witness that would nearly completely

14  undermine the credibility of that witness, would it not?  And

15  this plea agreement -- well, answer that question first.

16            MR. JACKSON:  Well, I think that would inure to the

17  defendant's benefit if the jury were to disbelieve the

18  testimony of the witness.

19            THE COURT:  But then that starts to ebb away at the

20  Government's case to the defendant's advantage.  Also that's a

21  plea agreement and *Giglio* and *Brady* cover this; correct?

22            MR. JACKSON:  Yes, Your Honor.

23            THE COURT:  That the Government had an obligation to

24  provide to counsel.  Perhaps in no one's wildest dreams,

25  because we couldn't really find a case on it, would we be in a

1   situation like this where a plea agreement was provided to the

2   defendants of a key witness, but the terms in black and white

3   on the plea agreement were not the terms.  At no time did the

4   Government contact Mr. Beck and Mr. Stone I imagine from the

5   discussion -- and tell me if I'm wrong, Mr. Beck and

6   Mr. Stone -- and say, hey, this 5K is not part of this

7   agreement.  When is the first time you learned that, Mr. Beck?

8            MR. BECK:  When Mr. Stein made his objection, Your

9   Honor.

10           THE COURT:  Yesterday in the course of trial in the

11   middle of his witness's cross examination on the 5K?

12           MR. BECK:  That's correct, Your Honor.

13           THE COURT:  Mr. Stone?

14           MR. STONE:  Same here, Your Honor.

15           THE COURT:  All right.  So that's the first they

16   heard of it.  Never was that plea agreement corrected.

17   Mr. Manford filed not one but two joint motions to continue

18   Mr. Fairchild's sentencing on the basis that he had a 5K

19   agreement with the Government.  Whether or not what Mr. Stein

20   told me was true, that he had the conversation with Mr. Manford

21   that Mr. Manford doesn't recall, whether or not that happened,

22   here's what's uncontested.  The record was not corrected in

23   Mr. Fairchild's case.  The defendants -- when it came, if you

24   believe Mr. Stein, to his attention that Mr. Manford thought

25   there was a 5K, presumably his client did as well.

 1          Never when Mr. Stein says that came to his attention

 2    by the filing of the second motion -- and he had this

 3    conversation with Mr. Manford; not the first, the second --

 4    never did he contact Mr. Beck and Mr. Stone and tell them that

 5    part of that plea agreement was incorrect.  I didn't hear that

 6    so I presume it didn't happen.  Never did he correct the record

 7    in Mr. Fairchild's case because what was told to the Court in

 8    those two motions that said they were joint motions was we have

 9    this 5K on the table.

10          Never was there an objection by the Government to

11    that portion of Mr. Fairchild's PSR because I looked.  And that

12    PSR was filed January 25th -- I'm sorry, disclosed January 29,

13    2018.  And never, even when Mr. Stein -- and I would hope he

14    did -- prepared for the testimony of Mr. Fairchild, one of your

15    key witnesses, I presume he would have then reviewed the plea

16    agreement because you know sometimes you get stuck there on

17    cooperation and everything else that you would have anticipated

18    the defendants would use in his cross.  Not even then were

19    Mr. Stone and Mr. Beck told that this term they had before them

20    in black and white on this plea agreement that had been around

21    since January -- I'm sorry, November 29, 2017, never were they

22    told paragraph 6 that doesn't apply even though the last

23    paragraph -- I'll use Mr. Stein's words, boilerplate

24    paragraph -- numbered paragraph in this plea agreement, even

25    though that states these 16 paragraphs constitute the entire

1   agreement between the defendant and the United States of

2   America in this matter.  There are no agreements,

3   understandings, or promises between the parties other than

4   those contained in this agreement.

5           How does anything Mr. Stein or any other witnesses

6   you would call at a hearing change the fact that Mr. Stone and

7   Mr. Beck in their preparation for the cross examination of

8   Mr. Fairchild never knew that the 5K agreement was not an

9   agreement since it was a term in this plea?  How does anything

10  Mr. Stein or any witness will tell me at a hearing change the

11  fact that these two attorneys in preparation of their defense

12  rely upon that?

13          MR. JACKSON:  Well, obviously nothing that the

14  witnesses would say in a hearing would change what the defense

15  attorneys relied on in their cross examination.  However, it

16  would put Mr. Stein's objection into what we think is its

17  proper context.

18          THE COURT:  His speaking objection that he made while

19  the witness was here on the stand and got tipped off to what

20  was going on and his speaking objection that he made in front

21  of this jury so the toothpaste, as I described it yesterday,

22  was already out of the tube?  I have racked my brain and

23  invited counsel to tell me yesterday on how to cure this.  I

24  don't know how to cure it.  I can't find a cure.

25          MR. JACKSON:  Well, Your Honor, I would say -- say a

1  few things.  First, a 5K motion is always at the discretion of

2  the United States Attorney's Office.  So, yes, that provision

3  is in the plea agreement; but it's also at the discretion of

4  the Government whether the person who has signed that plea

5  agreement receives that 5K.

6          Mr. Stein was -- his recollection of the

7  circumstances under which that plea agreement was signed, as

8  corroborated by the two agents who we would also call at any

9  hearing, demonstrates that the witness knew that he would not

10  qualify for a 5K.  That is to say that the office had already

11  exercised its discretion not to move for a 5K in his case.

12          THE COURT:  I don't care what he knew.  What I'm

13  asking you is what did Mr. Beck and Mr. Stone know?

14          MR. JACKSON:  So I --

15          THE COURT:  And they didn't know that it was not part

16  of this agreement.  They weren't told.  They presumed from

17  everything, until Mr. Stein stood up and objected, made that

18  speaking objection, that it was part of the agreement.  How has

19  this not affected their clients' rights?  How does it not

20  deprive their clients of a fair trial?  And why is this -- I

21  know Mr. Beck was very careful to avoid asking for a mistrial.

22  But how is this not a ground for me to sua sponte, based on

23  everything I've heard, declare a mistrial in this case?  And if

24  I declare a mistrial, double jeopardy attaches in this

25  situation, and we won't be trying this case again.

1          MR. JACKSON:   The Government understands the very

2    serious nature of this issue which is why we filed this

3    pleading, Your Honor, and which is why we're making the rather

4    extraordinary request that we are to preserve the testimony for

5    the record.   And I would just say that I am informed by

6    Mr. Stein that his course of dealing with the two defense

7    attorneys led him -- gave him the impression that they would

8    have understood that for this particular witness a 5K was

9    not -- it was not available.   And that is -- that's why he made

10   the objection that he did.

11          THE COURT:   What do you mean his course of dealing?

12          MR. JACKSON:   His prior course of dealing with these

13   two defense counsel.

14          THE COURT:   Mr. Stone, how many cases have you had

15   with Mr. Stein?

16          MR. STONE:   Judge, I think Mr. Stein and I've tried

17   two cases.   The Singh case and Ms. Myers' case.   I believe he

18   was counsel on the appeal of another case.

19          THE COURT:   So you've only been involved in a case

20   that has been indicted how many times besides this one?

21          MR. STONE:   I think I had the Singh case and --

22          THE COURT:   I'm not talking about ones that got to

23   the appellate stage.   I'm talking about --

24          MR. STONE:   I think two trial cases, Your Honor.

25          THE COURT:   Okay.   How about you, Mr. Beck?

```
 1              MR. BECK:  Your Honor, I've had two, perhaps three
 2    cases with Mr. Stein.  None have ever gone to trial.  One of
 3    them I was fired as a defense attorney.  The other one was
 4    dismissed.  And I can't even recall -- I think -- to be honest
 5    with you, I think there were three.  None went to trial
 6    however.
 7              THE COURT:  So one was dismissed by the Government.
 8              MR. BECK:  One was dismissed by Mr. Stein.  One I was
 9    fired.
10              THE COURT:  By your client on a court-appointed case?
11              MR. BECK:  Yeah.  He actually accused me of trying to
12    kill him which is a long story but --
13              THE COURT:  Okay.
14              MR. BECK:  -- with Mr. Stein.  And the other one I --
15    there could have been a third, but it didn't go to trial if it
16    was.
17              THE COURT:  Okay.
18              MR. JACKSON:  Your Honor, we would simply say that
19    the case law does show that dismissal of the indictment or a
20    mistrial after jeopardy has attached is obviously a very
21    drastic remedy.  The Government would say that a curative
22    instruction would be sufficient in this case where what the
23    jury really saw was some confusion between whether this
24    particular witness was or was not eligible for a 5K1.1 motion
25    which the jury likely doesn't really even understand what that
```

1 is.

2        THE COURT:  I'm not going to mislead the jury either

3 because it didn't sound like Mr. Manford was confused.  You

4 didn't see his face.  He was looking at me.  Mr. Manford -- I

5 don't know how many times Mr. Manford has appeared before me in

6 court.  So many I can't count.  And I can tell you that I've

7 tried equally as many cases as a prosecutor against

8 Mr. Manford.  I know from his facial expressions that he's

9 thinking something.  What he's thinking.  You should have

10 seen -- and I know when he's in difficult situations.  There

11 are times when he appears here where his client wants to say

12 one thing that he doesn't quite believe, but he says my client

13 wants me to tell you, Your Honor.  And --

14        MR. JACKSON:   I -- Your Honor --

15        THE COURT:  -- when he was here, and I asked him

16 pointed questions on whether he recalled the conversation he

17 had with Mr. Stein, what he believed the terms of the plea to

18 be, he struggled.  And I don't know whether Mr. Beck and

19 Mr. Stone, having worked with him umpteen times as well, saw

20 it, but he struggled with trying not to throw Mr. Stein under

21 the bus.  I'll tell you now, I don't think in ruling on this --

22 on these motions I have to make a determination on who is

23 telling the truth and who is not telling the truth.  But now

24 that we're here and I'm rethinking this, and I can see and

25 hear, and I've reviewed the transcript from yesterday -- that

1    portion of it -- I can see and hear Mr. Manford telling me what

2    the answers were to the questions I asked him, I can tell you

3    that Mr. Manford doesn't recall having the conversation

4    Mr. Stein had with him because it didn't happen.

5              MR. JACKSON:  And, Your Honor, I am absolutely not

6    saying Mr. Manford was being anything less than fully candid

7    and forthright with this tribunal.  I would have absolutely no

8    basis for suggesting that.  However, he was, according to the

9    three witnesses that the Government would present, present when

10   Mr. Fairchild was explained that he could not qualify for a

11   5K1.1 motion.

12             So I don't know what to make of that, Your Honor.  I

13   can only say to the Court that I have an assistant United

14   States attorney and two federal agents who were all present

15   with Mr. Fairchild and Mr. Manford during the time in which

16   this plea agreement was negotiated and struck and executed

17   which was very, very late at night.  And they have informed me

18   that it was very clearly delineated to Mr. Fairchild what his

19   three options were.  And, ultimately, he chose the second

20   option which was standard cooperation without the benefit of a

21   5K in the presence of his attorney.  That's why the Government

22   requested the hearing, and that's the testimony that we would

23   put on the record.

24             THE COURT:  Well, let's -- okay.  Then let's accept

25   that as true.  How does that change Mr. Beck's motion?  Because

1  he thought there was a 5K based on what was in the plea

2  agreement, in black and white, and prepared his cross

3  examination of this witness based upon that.  How does that

4  change anything?  And if it was that simple and it wasn't a

5  term -- and Mr. Stein knew it wasn't a term when he put it in

6  the agreement.  He knew it wasn't a term when Mr. Manford filed

7  two -- not one, but two motions to continue with the 5K as the

8  basis for the continuance.  When he saw Fairchild's PSR and

9  didn't object to it because it says it was a term.  Why didn't

10  he ever think, holy smokes, I'm going to trial on Reba Myers

11  and Ms. Lindquist's case.  I better tell Mr. Stone and Mr. Beck

12  that what is written in black and white is misleading because

13  this is *Giglio*.  I got to fix it.  He didn't.  So how does

14  anything that your agents or Mr. Stein could say to me in a

15  separate hearing on this case, belaboring this proceeding, how

16  can anything they have to say change what happened with regard

17  to how Mr. Beck and Mr. Stone saw it and how they prepared

18  their clients' defense and how their clients may or may not

19  have been in a position where now they're not having a fair

20  trial?

21          MR. JACKSON:  I mean I think it would go to show

22  whether there was actually misconduct or --

23          THE COURT:  Well, maybe that's an issue for the

24  ethics folks down in Charleston really because I -- how does

25  anything that happened on the Government's end have anything to

1    do with what Mr. Stone and Mr. Beck were proceeding on in the

2    course of their preparation for trial because they had it in

3    black and white and no one corrected it?

4           MR. JACKSON:  Your Honor, you are correct that

5    nothing that would happen at a hearing would change what has

6    already occurred.  These would be the cross examination that

7    the defense counsel prepared of Mr. Fairchild.

8           THE COURT:  So I can just accept your proffer for the

9    purposes of this hearing; correct?

10          MR. JACKSON:  You could.  I think that because of the

11   nature of this motion and what defense counsel has essentially,

12   you know, accused the Government of doing, I know that the

13   folks at this table want the opportunity to be heard and to

14   have that for the record.  Their testimony preserved for the

15   record.  That's part of why we made this request.

16          THE COURT:  Quite frankly, maybe Mr. Stein doesn't

17   want to testify in this proceeding about this issue and

18   conversations had and not had and what's boilerplate in plea

19   agreements and not, particularly since Mr. Beck has already

20   told me one thing he said yesterday was inaccurate based upon

21   what Mr. Beck learned as an officer of the Court from the

22   public defender down in the Southern District.  I really don't

23   think that's wise anyway.  But let me hear from Mr. Beck and

24   Mr. Stone about your motion, and then I'll address it.

25          MR. BECK:  Your Honor, I don't know if I can add any

1  more to it.  I don't think anything they would say would change

2  the equation here.  We're still in the same pickle.  And,

3  again, I -- as I said yesterday, there's two options.  A

4  dismissal for government misconduct or a mistrial, which we're

5  not asking for, but the Court sua sponte could do that.  That's

6  all I can say about it, Your Honor.

7          THE COURT:  Mr. Stone.

8          MR. STONE:  I don't have anything to add, Your Honor.

9          THE COURT:  Anything further on your motion,

10  Mr. Jackson?

11          MR. JACKSON:  The only thing that I would add is that

12  at the time that this plea agreement was negotiated, this was a

13  case in the Northern District of West Virginia.  And I am

14  informed that the policy of that office is that the defendant

15  and the position that Mr. Fairchild was in would not qualify

16  under any circumstances for a 5K1.1 motion.  I can't speak to

17  what the Southern District of West Virginia does except to say

18  that I'm told that they have a similar practice even if it is

19  not a matter of policy there.

20          THE COURT:  But technically testimony alone would

21  qualify; correct?  I'm not talking about the inner workings of

22  the decisions of how the Government in the Northern District of

23  West Virginia decides how they're going to file the motion or

24  not file the motion.  I'm asking you technically.

25          MR. JACKSON:  And I --

```
 1              THE COURT:  Testimony alone would qualify.
 2              MR. JACKSON:  Would qualify as -- I'm sorry --
 3              THE COURT:  A 5K.  If someone -- if the Government
 4    files a 5K motion in front of me --
 5              MR. JACKSON:  Your Honor, it --
 6              THE COURT:  -- that would qualify --
 7              MR. JACKSON:  It could, yes, because it's always in
 8    the discretion of the United States Attorney's Office what
 9    qualifies.  It is in the Government's --
10              THE COURT:  Right.
11              MR. JACKSON:  -- sole discretion.
12              THE COURT:  But what I -- because what Mr. Stone
13    basically said to this -- Stein said to this jury was he's not
14    eligible for a 5K.  And they would have assumed that meant he
15    could never get it.  That's an interpretation they could make.
16    Technically, testimony alone would enable me, if the motion was
17    filed based on testimony alone, to grant it; correct?
18              MR. JACKSON:  Yes.
19              THE COURT:  Okay.  Anything further on your motion?
20              MR. JACKSON:  No, Your Honor.
21              THE COURT:  Thank you.  Let me ask you something
22    else, Mr. Jackson.  Mr. Stein told us up here at sidebar that
23    that 5K paragraph is boilerplate in the plea agreements, the
24    written plea agreements, but it doesn't mean anything in some
25    of these cases.  Is that true?
```

1      MR. JACKSON:  I don't know whether it's -- I do not

2  know whether it is boilerplate or not although --

3      THE COURT:  Okay.  Then let me ask you this.  It was

4  put in this one, and it was put in this one, but it was

5  meaningless; correct?  No, Mr. Stein, I'm asking a question.

6  It was put in this one, but it was meaningless is what you're

7  telling me?

8      MR. JACKSON:  No, Your Honor.  And we explained in

9  our pleading that plea agreement was already drafted and was in

10  hand at the time they confronted Mr. Fairchild at the West

11  Virginia State Police Barracks.

12      THE COURT:  Did anybody have a pen that they could

13  have just crossed it out?

14      MR. JACKSON:  Of course, Your Honor.  But because of

15  the very late hour and because of the fact that everybody had

16  talked about what was on the table for Mr. Fairchild, and they

17  thought that they had reached an understanding, nobody thought

18  to cross it out.

19      THE COURT:  We have a lawyer here, a defense lawyer

20  named Sherman Lambert, and if he were in this courtroom, his

21  response to that would be sloppy.  And he would have said that

22  word in about four syllables.

23      MR. JACKSON:  I can't defend leaving a provision in a

24  plea agreement that was not going to be ever operational.

25  Nevertheless --

```
1              THE COURT:  Can you -- and can you defend leaving
2    that in a plea agreement that you hand over as is your
3    obligation?  You're duty bound to hand it over to defense
4    counsel before trial.  Can you defend that?
5              MR. JACKSON:  Well, obviously, the plea agreement was
6    produced as was the Government's responsibility.  The -- I
7    think the -- it certainly would have been a better practice to
8    have -- to have informed defense counsel that that 5K was not
9    available to Mr. Fairchild.
10             THE COURT:  And if I understand what you're telling
11   me your witnesses would say, is that this paragraph 6, which
12   talks about the 5K, that there was really never any
13   consideration by the United States to ever make that motion in
14   this case.  So it was part of this written plea agreement, but
15   the Government never had any intention of filing that motion
16   going into this at the time the plea agreement was signed.
17             MR. JACKSON:  Yes because the plea agreement makes
18   clear that it is only in the discretion of the United States
19   Attorney's Office.
20             THE COURT:  But -- but, even though it makes clear it
21   was in their discretion, they never even planned to consider
22   it.
23             MR. JACKSON:  They had already exercised their
24   discretion.
25             THE COURT:  They had already decided they weren't
```

1  going to -- they had already decided they weren't going to ever

2  file a 5K motion in Mr. Fairchild's case at the time

3  Mr. Fairchild signed this plea agreement.

4        MR. JACKSON:  I believe that's correct although

5  presumably there's always a possibility that a cooperating

6  defendant could do something additional that would then qualify

7  him for that.  I don't think that's --

8        THE COURT:  Well, Mr. Stein told us the only way he

9  could have done it was to have worn a wire yesterday and made

10  some buys like in a drug case.

11        MR. JACKSON:  I understand that.  The reason why that

12  was even contemplated with Mr. Fairchild was because it was

13  thought that he was in a position to help the authorities in

14  New York against an organized crime figure, and that is the

15  basis for which he would have been eligible to receive the

16  5K1.1.

17        THE COURT:  But Mr. Stein told us yesterday, and he

18  told me in front of this jury, and he told me several times he

19  was never eligible for it.  So it's kind of different.  We

20  never heard about New York yesterday.  Right?

21        MR. JACKSON:  Yes, Your Honor.  I think that

22  obviously we didn't go into all the facts and circumstances

23  surrounding Mr. Fairchild's plea agreement yesterday.

24        THE COURT:  Okay.  Thank you.

25        There is nothing that I can hear further from

1  Mr. Stein or any of the case agents in this case that would

2  change what happened on the end for the defense and these

3  defendants.  I can accept what you have told me here today as a

4  proper -- I'm sorry, as a proffer, Mr. Jackson; and since I'm

5  accepting it as a proffer, and I don't see how it would change

6  anything related to Mr. Beck's motion, then I'm going to deny

7  the request for a hearing by the Government.  We'll note the

8  Government's exception to it.

9          Mr. Stone, you said with regard to Mr. Beck's motion,

10  you have nothing further to add or do you?

11          MR. STONE:  Judge, no -- I mean we join it, but, you

12  know, I understand the recitations and representations made by

13  Mr. Jackson; but we had that bench conference and counsel for

14  Mr. Fairchild stated his understanding.  And based upon the

15  representations of Mr. Fairchild's counsel, the represent --

16  his understanding was Mr. Fairchild was eligible for a 5K based

17  upon both grand jury and trial testimony.  And he definitely

18  seemed to be shocked to be learning at that bench conference,

19  while his client was on the stand, that now he wasn't eligible

20  for a 5K.  So, you know, that's something that's not

21  controverted.

22          So, you know, regardless of what Mr. Stein and the

23  agents may recall -- and I mean clearly, you know, probably the

24  better way to have handled it was to object and have a bench

25  conference, but all of this was blurted out to the jury.  And

1  it -- you know, it really casts I believe Mr. Beck in a

2  negative light in front of the jury for in a sense trying to

3  create the inference that somehow he was trying to mislead the

4  jury.  And, again, as Mr. Beck said, upon reflection, I'm not

5  really sure how you can cure that.

6          THE COURT:  At the stage we are now, does the fact --

7  let's -- I won't use the word fact.  Let's say that

8  Mr. Fairchild did understand, even though it sounds like his

9  attorney didn't, that he -- so I don't know how he understood

10  it and his attorney didn't.  Let's say Mr. Fairchild understood

11  5K -- possibility of 5K motion was not on the table.  Does that

12  change anything on your end, Mr. Stone or Mr. Beck?  And I'll

13  hear from you first, Mr. Stone, since you're standing.

14          MR. STONE:  I don't believe so, Your Honor.  We --

15  again, I crossed him with the understanding that he was

16  eligible for a 5K and hoped to obtain a benefit from his

17  testimony.  I brought it up.  I -- there wasn't an objection

18  during my cross.

19          THE COURT:  That's what I wonder.  Why wasn't --

20  Mr. Jackson, why wasn't there an objection during Mr. Stone's

21  cross?

22          MR. JACKSON:  Your Honor, I think the United States

23  always tries to make objections only when we think that it

24  might really have an impact and also there's times when you

25  just don't object even if something is objectionable.  And I

1    think it wasn't until Mr. Beck had gone over this territory

2    again, and it appeared to Mr. Stein that it was

3    mischaracterizing the nature of the agreement that the United

4    States had.  Not based on the language of the plea agreement

5    but just based on his own recollection of what the agreement

6    was and that Mr. Fairchild had testified consistent with what

7    the agreement actually was.  That that's when we chose to

8    object.

9              THE COURT:  Thank you.  Mr. Stone.

10             MR. STONE:  Judge, again -- I mean, again, it creates

11   the inference that, you know, these defense lawyers are just

12   trying to, you know, pull the wool over our eyes.  And, again,

13   I don't know if Mr. Stein just kind of lost his temper, wasn't

14   thinking, but it was all blurted out for all to hear.  And I

15   mean I just -- clearly it was improper and it's prejudicial.

16   And it's -- again, that's inconsistent with the documents we

17   were provided.  I mean obviously if I had known that Fairchild

18   is not eligible for a 5K, I probably wouldn't have asked him

19   about it because it wouldn't have made any sense to even ask

20   him about it.

21             THE COURT:  Thank you, Mr. Stone.  Mr. Jackson.

22             MR. JACKSON:  Your Honor, I think the important thing

23   for the jury to know is that the witness would receive a

24   benefit in exchange for his testimony before this Court.  And

25   they heard that.  And he testified that he was hoping to get

1    some benefit out of what he was here doing today.  That

2    ultimately -- the jury ultimately understands I think from

3    everything that happened that Mr. Fairchild is a Government

4    cooperating witness and that he -- and that they can take that

5    fact into consideration when they decide what weight to give to

6    his testimony.  The -- I don't think that the prejudice that

7    has occurred to -- from defense counsel asking some questions

8    about a 5K is so significant to warrant the very drastic remedy

9    of dismissal of the indictment.

10              THE COURT:  Mr. Beck.

11              MR. BECK:  Your Honor, I would just say by virtue of

12   the objection being made in the presence of Mr. Fairchild, he

13   knows exactly what to say now.  He's going to pair it to what

14   Mr. Stein said.  And the problem with that is you have -- and I

15   believe now becomes *Brady* -- two motions that Mr. Stein joined

16   in to grant him a 5 -- to possibly grant him a 5K1 motion.

17   Then all that has to come in, and the jury is going to be

18   sitting there saying what is going on here.  That's why I just

19   don't think it can be fixed, Your Honor.  That cat is out of

20   the bag.  It's gone off the rails.  And it's the Government's

21   fault for whatever reason.  Something has to be done.  I think

22   either dismissal based on our motion or the Court exercising

23   its own discretion.

24              THE COURT:  All right, counsel.  We all know or we

25   should know that the Government is duty bound, pursuant to

1   *Giglio*, to turn over a plea agreement; correct?  Especially

2   where a witness's testimony is integral to the case.  So

3   evidence of any understanding or agreement as to a witness's

4   prosecution is relevant to his credibility, and the jury is

5   entitled to know it.  The Government has an affirmative duty to

6   produce evidence which is materially favorable to the accused,

7   in this case, Ms. Lindquist and Ms. Myers, either as direct or

8   impeaching evidence.  And this is the scenario in which this

9   arose.  Impeaching evidence of a key Government witness.  The

10  existence of an agreement between the witness who has the plea

11  agreement with the Government is absolutely material to the

12  defendant's case.  And I find that it is here.

13          Regardless of the Government's attorney's intent --

14  I'm not saying that Mr. Stein did anything intentional here.

15  But whether it's intentional or unintentional, the failure to

16  disclose a plea agreement, and it goes without saying then a

17  term of a plea agreement -- in this case, the negative of a

18  term that was in this plea agreement in black and white --

19  violates the due process clause.  We've got this layer of

20  *Giglio* and *Brady* through this issue and this motion raised by

21  Mr. Beck.  This term of this plea agreement, which Mr. Beck and

22  Mr. Stone relied upon, was withheld in the reverse because it's

23  in the plea agreement, and they relied upon it in their

24  preparation of their clients' defense.  Yet I'm being told it

25  was not part of the agreement.

1            I find that there's a reasonable probability in this

2    case that at this point, the outcome would be different in this

3    case having now learned that one side, the Government, is

4    disputing this term of the plea agreement which is in their own

5    agreement that they prepared.

6            I can't see -- I can't see how to cure this because I

7    find there's a reasonable probability that the outcome of this

8    case would be different if the jury listens and considers what

9    Mr. Stone and Mr. Beck put forward before them with regard to

10   the 5K as opposed to whether now we try to suck it back and put

11   it under the rug.  I don't think there's any way we can do that

12   nor have I heard any way we can do that.

13           And I don't have to get into a discussion of what's

14   true or what's not true with regard to what Mr. Stein told me

15   and what Mr. Manford told me with regard to these

16   disagreements, including whether Mr. Manford was told at some

17   point after his -- at the time of or after his client signed

18   the plea agreement that the 5K wasn't on the table, what

19   discussions the Government had with Mr. Fairchild.  My focus is

20   on what the lawyers in this case don't dispute.  And this is

21   what no one disputes because it's irrefutable.  This plea

22   agreement was turned over to Mr. Stone and Mr. Beck.  The plea

23   agreement of Mr. Fairchild.  About when was this plea agreement

24   that was signed November 29, 2017, provided to you?  Mr. Beck

25   or Mr. Stone?

```
 1                    MR. STONE:  Judge, I think we got it through a PACER
 2     notification.  I think it was -- I think we got it that way.
 3                    THE COURT:  About how long ago?
 4                    MR. STONE:  Shortly --
 5                    MR. BECK:  Many months ago, Your Honor.
 6                    MR. STONE:  Yeah.
 7                    MR. BECK:  It was early on in discovery.
 8                    MR. STONE:  Right.
 9                    THE COURT:  So it was provided to you on PACER
10     because it came up because he was a codefendant in this --
11                    MR. STONE:  Yeah, I think December --
12                    THE COURT:  -- case?
13                    MR. STONE:  December of 2017.
14                    THE COURT:  Okay.  So you got it because you were
15     attorneys of record in the case as a whole?
16                    MR. STONE:  I think we got that -- it might have been
17     part of -- I can't identify -- there were so many documents
18     disclosed, Judge.  I can't say what --
19                    THE COURT:  Okay.  So it was around December --
20                    MR. STONE:  Right.
21                    THE COURT:  -- of 2017.  Is that your best
22     recollection, Mr. Beck?
23                    MR. BECK:  That's right, Your Honor.  I agree.
24                    THE COURT:  Okay.  In black and white in this
25     document, signed by Mr. Fairchild and Mr. Manford on each and
```

1   every page, in paragraph number 6, this plea reads, "If, in the

2   sole opinion of the United States Attorney, the defendant has

3   provided substantial assistance in the investigation or

4   prosecution of another person who has committed an offense, the

5   Government will file a Section 5K1.1 motion for a sentencing

6   guidelines reduction."

7           Paragraph 16 states, "These 16 paragraphs constitute

8   the entire agreement between the defendant and the United

9   States of America in this matter.  There are no agreements,

10  understandings, or promises between the parties other than

11  those contained in this agreement."

12          Mr. Stein signed this agreement, and the signature is

13  right under paragraph 16.

14          No attorney, much less a reasonable attorney, would

15  not rely upon the terms that are set forth in black and white

16  in this written plea agreement in preparing for the cross

17  examination of a key witness against their client.  At no time

18  did the Government tell Mr. Stone or Mr. Beck that paragraph 6

19  was not part of the agreement.  The first they heard of it was

20  in the middle of Mr. Fairchild's cross examination on the

21  stand.  But it wasn't in the middle of Mr. Beck's cross

22  examination of Mr. Fairchild.  He went second.  I'm sorry.  It

23  wasn't in the cross examination of Mr. -- in Mr. -- it wasn't

24  in Mr. Stone's cross examination of Mr. Fairchild.  He went

25  first.  It arose during Mr. Beck's cross examination of

1   Mr. Fairchild.  Mr. Beck went second.

2        Then there were two motions to continue filed by

3   Mr. Manford in this case to continue Mr. Faircloth's

4   sentencing.  One was filed in April of 2018 moving to continue

5   Mr. Fairchild's April 16, 2018, sentencing.  And in it

6   Mr. Manford states the basis for the motion is the 5K1 and his

7   client's anticipated testimony at Ms. Myers' and

8   Ms. Lindquist's trial, and it states the Government joins in

9   the motion.

10       Again, Mr. Manford filed a second motion to continue

11   in August 2018 moving to continue the August 20, 2018,

12   sentencing of his client on the same basis as the first and

13   states that the Government joined in the motion.  It doesn't

14   say Government did not oppose which we often see.  It says

15   Government joins in the motion.

16       Mr. Stein told us when we were talking about the

17   second motion here yesterday that he realized and called

18   Mr. Manford and told him the 5K was not on the table at that

19   time.  Mr. Manford doesn't recall the conversation.  But if as

20   early as August 2018 Mr. Stein realized that the 5K was thought

21   by Mr. Manford to be part of the plea, he didn't let Mr. Stone

22   or Mr. Beck know that it wasn't part of the plea then or any

23   time thereafter; and he didn't correct the record with regard

24   to the first or second motion.

25       It doesn't look like there was any motion to seal

1    these two motions, Mr. Beck and Mr. Stone.  Did you receive

2    them as part of just a regular CME/CF?

3              MR. BECK:  No, Your Honor.

4              MR. STONE:  No, Your Honor.

5              THE COURT:  Okay.  Ms. Fletcher tells me she checked

6    just now.  That they were sealed.  All right.

7              There also weren't any objections to the portion of

8    Mr. Fairchild's PSR where it was noted in paragraph 29 -- and

9    that PSR was filed January 29, 2018 -- there weren't any

10   objections by the Government to that paragraph stating there

11   was a 5K1 component to the plea agreement.  And I would have

12   presumed when prepping for this witness's, Mr. Fairchild's,

13   testimony, the Government would have had the plea agreement

14   there before them and anything else that may come up during the

15   course of Mr. Fairchild -- I'm sorry, during the course of

16   Mr. Fairchild's testimony, and yet Mr. Stein didn't alert

17   Mr. Stone or Mr. Beck to this either.  And I'm sorry I keep

18   switching back between Faircloth and Fairchild.  It is

19   Mr. Fairchild.  The motions have John Barrat Faircloth on them

20   that Mr. Manford filed in Mr. Fairchild's case, but it is

21   Fairchild.  Correct, counsel?

22             MR. BECK:  That's right, Your Honor.

23             MR. STONE:  Yes, Your Honor.

24             THE COURT:  All right.  So the first Mr. Beck and

25   Mr. Stone learned that Mr. Stein was asserting before this jury

1  that the 5K was not part of the agreement with Mr. Fairchild

2  and that Mr. Fairchild, in his words, was not eligible for the

3  5k -- and I don't want to misquote him so let me make sure I've

4  got it correct.

5            Mr. Stein said -- objected and said mischaracterizing

6  the cooperation of the agreement -- Mr. Beck was -- and that

7  he's talking about a 5K1, and this witness is not eligible for

8  a 5K and can never get a 5K.  So that he, referring to

9  Mr. Beck, is suggesting and the witness doesn't know what he's

10  talking about so the witness has said he doesn't know and in

11  the end, it's up to the Court.  That's his understanding.  And

12  Mr. Stein went on, in response to a question by the Court of

13  why it's in the plea agreement if the witness wasn't eligible,

14  to say the 5K, it's a boilerplate agreement.  That the option

15  is open if he earns it.  In this case, you have to do several

16  things to earn a 5K which involves a level of cooperation that

17  this witness is not capable of; and, therefore, he's not

18  eligible to get a 5K1.  The United States attorney will not

19  recommend a 5K1.  He's never been promised a 5K.  And the

20  witness is not mischaracterizing his testimony.  He's

21  testifying to what it is.  And for Mr. Beck to keep coming back

22  and saying the Government has agreed to do this for you, it's a

23  may, if in the discretion of the Unites States, he's qualified

24  for 5K, and he can't qualify for 5K.

25            So the first, Mr. Stone and Mr. Beck -- and this

1    Court because I read all of this that I have before me in

2    preparation for this trial too -- the first we heard of this

3    was when Mr. Stein stood up and made that speaking objection

4    before the witness on the stand and before the jury in this box

5    to my right.  And that very well could have tipped off the

6    witness to where his testimony needed to be going.  And

7    Mr. Stein's attempt to correct Mr. Beck made it look to this

8    jury that Mr. Beck was mistaken.  And most importantly, it

9    pulled the rug out from the preparation for the testimony of

10   this material witness by Mr. Stone and Mr. Beck because that

11   line of questioning goes to the real heart of the credibility

12   of that witness because it goes to his motivation to lie in a

13   big way because he would be receiving a benefit from the

14   Government.  And not a benefit as far as, oh, I testified.  I

15   did a good thing, and the Government is going to move for the

16   Court to be more lenient because of that in my sentencing.  In

17   a bigger way because the starting point under the guidelines

18   for the Court to sentence this witness would be lower if he

19   received several levels of a reduction by the Court in the

20   calculation of his guideline range if the Court had granted a

21   5K motion by the Government.

22           These defendants were prejudiced in their preparation

23   of their defense in relying upon what they received from the

24   Government with regard to what the deal was on paper in black

25   and white, never disputed or clarified or corrected for them.

1  It was detrimental to the preparation of their defense.

2          There's no way to cure this *Giglio* and *Brady* problem

3  that has been presented to this Court in this case involving

4  the agreement the Government had with Mr. Faircloth and how it

5  played out in the course of this trial.  I don't take declaring

6  mistrials lightly.  My hope is that all these trials, if they

7  can and there's sufficient evidence to present to the jury, go

8  to the jury and for them to consider all the evidence presented

9  and the law and figure it out for themselves.  But we have a

10  case here where an inaccurate -- if we believe what Mr. Stein

11  has told us -- an inaccurate plea agreement was provided to

12  Mr. Stone and Mr. Beck, and it interfered with their

13  preparation of effective cross examination of an important

14  Government witness in this case.

15          And after Mr. Stone's initial cross examination with

16  regard to the 5K, which did not draw an objection, and then in

17  the middle of Mr. Beck's discussion of this 5K with this

18  material Government witness, the Government made a standing

19  objection interjecting that 5K was not part of the agreement

20  and was never considered by the Government.  And they would

21  make a motion, and this witness on the stand was not eligible.

22  That seriously interfered with the defendant's examination of

23  this key witness and goes to the very heart, as I've said, to

24  his credibility.  There's no curative instruction to fix that.

25          The prosecutor's remarks are one thing.  The

1   prosecutor's conduct in providing this written plea agreement

2   to Mr. Stone and Mr. Beck, which they relied upon to the very

3   middle of Mr. Fairchild's cross examination, that conduct was

4   improper.  They should have been told before they prepared

5   their defense that this term was not part of the agreement if

6   that, in fact, was true.  That conduct prejudicially affected

7   each of these defendants', Ms. Myers and Ms. Lindquist,

8   substantial rights and deprived them of a fair trial.

9         I'm not saying that Mr. Stein's inactions were

10  intentional.  The result of the conduct is the same, however,

11  and the effect upon these defendants' rights is the same.

12  Absent those remarks with regard to the 5K not being on the

13  table, the jury could have made the determination that this

14  witness was not telling the truth and that absolutely would

15  have affected the strength of the defense in this case and

16  absolutely would have affected proof of establishing the

17  defendants' guilt in this case.

18        And as I stated, I can't think of any curative

19  instruction and have not been presented with any curative

20  instruction that I can determine would fix this.  And I don't

21  think, and I so find, that in declaring a mistrial sua sponte,

22  which is what I'm doing at this point on the basis that I've

23  placed upon the record, this case can't be tried again.  These

24  defendants, through no wrong of their own or their attorneys,

25  have been deprived of the right to have their trial completed

1  by a particular tribunal and that's this jury that we've had

2  here for four days, going on five days of trial.

3          As a matter of manifest necessity, I am sua sponte

4  declaring a mistrial in this case.  Double jeopardy attaches,

5  and we will not try this case again.

6          I'll note the exception of the Government to the

7  Court's ruling here today.

8          We owe it to this jury who changed business plans --

9  one of which changed business plans to continue their duty as a

10  citizen to serve on this jury and another who has changed an

11  operation to serve and perform their civic duty, to bring them

12  out here and tell them that the Court has decided on a matter

13  of legal significance discussed among counsel that a mistrial

14  must be declared and that their work here is finished.  But I

15  think we owe it to them to tell them that.  Particularly, since

16  we've had them back there for quite a while while we discussed

17  this important issue.

18          And I will say, counsel, I don't take this decision

19  lightly.  I have agonized and belabored over this all evening

20  and preparing with this and researching this issue with my

21  clerks.  And I have come to the only decision that's

22  appropriate based upon what I've been presented in this case.

23  And it gives me no pleasure to make this decision, particularly

24  under the circumstances with which it arose.

25          We'll go ahead and bring our jury out.

```
 1              (The jury returned to open court at 9:53 A.M.)

 2              THE COURT:  Have a seat, ladies and gentlemen.  Good

 3   morning and welcome back.  I know, you know, we broke a little

 4   earlier than we anticipated yesterday, and we had you back

 5   there for a while this morning before we brought you out here.

 6              I know that you all have been very attentive during

 7   the course of this trial.  We had one juror who changed some

 8   business plans to make sure he could continue performing his

 9   civic duty and finish this through to verdict.  We had another

10   juror who moved around an operation so she could perform her

11   part.  And that's commendable.  We don't always have jurors who

12   are trying to complete their service.  Sometimes and probably

13   in each case there's someone who just doesn't want to be here.

14   I know we've got a teacher who has been away from her class as

15   well and other folks who have jobs and family obligations.  So

16   I appreciate the service that you have performed here in this

17   case.  Everyone took it very seriously.

18              We broke early yesterday because an issue arose that

19   the Court and counsel needed to discuss which would change the

20   procedural direction of this case.  It was significant and

21   important enough that we recessed for the evening to do some

22   more research and consider the discussion that was had here on

23   the record after you left for the day.  And after considering

24   the arguments of counsel and the circumstances under which the

25   issue arose, I have determined sua sponte to declare a mistrial
```

1  in this case.  The outcome of this means that considering the

2  law as I viewed it and the circumstances, double jeopardy

3  attaches and, therefore, these defendants won't be tried again.

4          Ordinarily, we would get to your being able to decide

5  this case and your word being the final resolution of this

6  case.

7          During the course of my instructions to you, I would

8  tell you that even though I'd instructed you throughout the

9  trial not to discuss the case among yourselves or with anyone

10 else, you can discuss the case with yourselves or anyone else

11 with whom you choose to discuss it.  However, no one can

12 contact you.  Not the lawyers, not their clients, or anyone

13 else and ask you any questions about the case unless the Court

14 permits them to.  So in other words, you're free to talk about

15 it on your own, but no one can contact you and require you to

16 talk to it -- to talk to them about it.  Okay.  So I thought

17 I'd let you know that.  So your duty here is different than a

18 grand jury.  A grand jury can never talk about the proceedings.

19 You all are fine.  Because I know that a lot of jurors find

20 their service interesting, and the case is interesting, and

21 after the fact, they like to discuss it with their husband or

22 their wife or their family.  And that's just fine.

23         Any comments for us or questions before we let you

24 go?  Yes, ma'am.

25         JUROR:  Since this is my third month, this will mean

1   after today I will no longer get summonsed for this three-month

2   period; correct?

3           THE COURT:  I always confuse that with when I was a

4   judge in circuit court so we'll let Mr. Mullen, who is the

5   expert, let you know.

6           THE CLERK:  You should be completed.  Your service.

7           JUROR:  All right.  Thank you.

8           THE COURT:  Okay.  That's everyone.

9           THE CLERK:  Uh-huh.

10          JUROR:  Okay.

11          THE COURT:  Okay.  All right.  I know we've got

12  Thanksgiving and Christmas coming up.  You all have a great

13  holiday season.  And thank you so much for your service.  I am

14  sorry for you that you didn't get to be the final answer on

15  this case.  Thank you.

16          (The jury was excused from the courtroom.)

17          THE COURT:  Our jury has exited the courtroom.

18  Please be seated, counsel.

19          I'm going to direct the clerk to make an entry in the

20  court file that Mr. Beck's motion has been mooted by virtue of

21  the Court's sua sponte declaring a mistrial in this case.  I

22  will note the exception.  He'll note the exception of the

23  Government.  We'll include the Court's ruling on the

24  Government's motion that was made this morning as well.  I

25  don't want to enter a paper order.  I think my findings were

1   comprehensive on the record because a written order out there

2   on the court docket would end up being yet another piece of

3   paper that could get into the wrong hands about a witness's

4   cooperation.  So we'll just leave it at that.

5              Mr. Jackson.

6              MR. JACKSON:  Yes, Your Honor.  Just a point of

7   clarification.  The -- I understand the Court then granted our

8   special motion for leave to file in opposition?

9              THE COURT:  Yes.

10             MR. JACKSON:  Does that then become part of the

11  record in this case?

12             THE COURT:  Yes.  Yes.  Absolutely.

13             MR. JACKSON:  Thank you, Your Honor.

14             THE COURT:  You're welcome.

15             Anything further on behalf of your client, Mr. Stone?

16             MR. STONE:  No, Your Honor.

17             THE COURT:  Mr. Beck?

18             MR. BECK:  No, thank you, Your Honor.

19             THE COURT:  All right.  The bailiffs or CSOs are

20  going to make sure that nobody leaves the courthouse until the

21  jury has exited.  And I will remand Ms. Myers to the custody of

22  the United States Marshals.

23

24             (Court adjourned at 10:00 A.M.)

25

CERTIFICATE

1

2

3          I, Kate A. Slayden, Registered Professional Reporter

4    and Official Court Reporter of the United States District Court

5    for the Northern District of West Virginia, do hereby certify

6    that the foregoing is a true and correct transcript of an

7    excerpt of the proceedings had in the above-styled action on

8    November 8, 2018 and November 9, 2018, as reported by me.

9          I certify that the transcript fees and format comply

10   with those prescribed by the Court and the Judicial Conference

11   of the United States.

12         Given under my hand this 28th day of November 2018.

13

14                              /s/Kate A. Slayden
                                _____
15                              Kate A. Slayden, RPR
                                Official Reporter, United States
16                              District Court for the Northern
                                District of West Virginia
17

18

19

20

21

22

23

24

25